**UNITED STATES of America, Plaintiff,**

**v.**

**Jack L. CLARK et al., Defendants.**

**No. 72 Cr. 1356.**

United States District Court, S. D. New York.

March 30, 1973.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y. (Gary P. Naftalis, and Shirah Neiman, Asst. U. S. Attys.), for United States.

Wilmer, Cutler & Pickering, Washington, D. C. (Arthur F. Mathews, Michael R. Klein, and Ronald D. Rotunda, Washington, D.C.), and Poletti Freidin Prashker Feldman & Gartner, New York City (Paul R. Grand, New York City), for defendant Clark.

Curtis, Mallet-Prevost, Colt & Mosle, New York City (Peter Fleming, Jr., John E. Sprizzo, and John F. Egan, New York City), for defendants Wahrman, Bolka and Madole.

Patterson, Belknap & Webb, New York City (Robert P. Patterson, Jr., New York City), for defendant Gray.

Golden, Wienshienk & Mandel, New York City (Ralph Wienshienk, and Bernard Rothman, New York City), for defendant Linn.

## OPINION

GRIESA, District Judge.

This is a criminal action arising from the financial misfortunes of Four Seasons Nursing Centers of America, Inc. ("Four Seasons"). The defendants named in the indictment occupied the following positions at the relevant times: Jack L. Clark, president and chairman of the board of Four Seasons; Thomas J. Gray, vice president of Four Seasons; James P. Linn, president of Four Seasons Franchise Centers, Inc. ("Franchise"); Gordon H. McCollum and Glenn R. Miller, officers of Walston & Co., investment bankers for Four Seasons; Kenneth J. Wahrman, Edward J. Bolka and Jimmie E. Madole, accountants with Arthur Andersen & Company.

Defendants McCollum and Miller have pleaded guilty to Counts 1, 16, 17 and 34 of the indictment, and have pleaded not guilty to the remaining counts. The other six defendants have pleaded not guilty to all the counts of the indictment.

There are a total of 65 counts in the indictment, although the basic charges of wrongdoing are really fewer. Count 1 charges conspiracy to violate Section

17(a) of the Securities Act of 1933 and Sections 10(b), 12 and 13 of the Securities Exchange Act of 1934, as well as S. E.C. Rules 10b-5 and 13A. Count 1 also alleges conspiracy to violate the mail fraud statute, 18 U.S.C. § 1341. Basically, Count 1 charges that beginning in 1967 there was a conspiracy to promote the stock of Four Seasons through the issuance of false financial reports and through other illegal means. It is alleged that a prospectus dated May 9, 1968 for 360,000 shares of Four Seasons stock was false and misleading. It is alleged that the audited financial statements for the fiscal year ending June 30, 1968, which were incorporated in a prospectus of November 26, 1968 for the sale of 400,000 shares of Four Seasons stock, were false and misleading. Count 1 asserts that in November 1968 certain of the defendants caused the creation of Four Seasons Equity Corporation ("Equity"), to which Four Seasons made substantial sales, which were in fact false and fictitious because Four Seasons controlled Equity. Count 1 asserts that in April 1969 another company was created—Four Seasons Franchise Centers, Inc.—which was later used to generate substantial fictitious earnings for Four Seasons. It is alleged that the audited financial statements for the fiscal year ending June 30, 1969 were false and fictitious as were the unaudited interim statements for the three months ending September 30, 1969 and the six months ending December 31, 1969. It is alleged that in July 29, 1969 a further corporation was created, Four Seasons Overseas N.V. ("Overseas"), which sold $15 million in debentures in Europe on the basis of the alleged false financial statements of June 30, 1969.

Counts 2–34 charge all eight defendants with substantive violations of Section 10(b) of the 1934 Act and S.E.C. Rule 10b-5. All of these counts incorporate by reference the allegations of Count 1 as to the basic alleged illegal conduct on the part of defendants. The breakdown into individual counts arises because it is alleged that the defendants caused various individual purchase confirmations and orders for Four Seasons stock to be mailed or telegraphed, thus involving use of instrumentalities of interstate commerce or the mails in violation of the statute.

Counts 35–55 allege violation of the mail fraud statute, 18 U.S.C. § 1341. Again the same basic charge of fraudulent conduct is repeated, and the individual counts arise from the allegation that defendants caused the mailing of various purchase confirmations for Four Seasons stock.

Count 56 charges all defendants, except McCollum and Miller, with mail fraud in connection with soliciting a loan for Four Seasons from the State of Ohio.

Counts 57–61 charge defendants Clark, Gray and McCollum with violation of Section 17(a) of the 1933 Act in connection with sales by them of Four Seasons stock.

Count 62 charges all defendants, except McCollum and Miller, with violation of Section 17(a) of the 1933 Act in connection with the offering and sale of the Overseas debentures.

Count 63 charges defendants Clark, Gray and Wahrman with violation of Sections 12 and 13 of the 1934 Act in connection with the filing of a Listing Application with the American Stock Exchange and the S.E.C. It is alleged that this Listing Application contained a false and misleading financial statement of Four Seasons for the fiscal year ending June 30, 1968.

Count 64 charges all defendants, except McCollum, with violation of Section 13 of the 1934 Act in connection with the filing of a Form 10K with the American Stock Exchange and the S.E. C. It is alleged that this 10K overstated earnings of Four Seasons for the fiscal year ending June 30, 1969.

Count 65 charges all defendants, except McCollum and Miller, with violation of Sections 12 and 13 of the 1934 Act, in connection with the filing of an annual report of Four Seasons with the Ameri-

can Stock Exchange and the S.E.C. It is alleged that this annual report overstated the earnings of Four Seasons for the fiscal year ending June 30, 1969.

Those defendants who have not pleaded guilty are vigorously defending the action and strongly deny the actions of wrongdoing against them. Numerous motions have been made, certain of which will be discussed in this memorandum.

Defendants Wahrman, Bolka and Madole have moved to dismiss Counts 2–34 on the ground that venue is improperly laid in the Southern District of New York. These same defendants have also moved under Criminal Rule 21(b) to transfer the entire case as to them to the Western District of Oklahoma, on the ground that Oklahoma is a far more convenient forum, and far more intimately connected with the transactions in question, than New York. Finally, defendants Wahrman, Bolka and Madole move for a severance under Criminal Rule 14 on the ground that the issues as to them are sufficiently separate as to warrant a separate trial.

Defendant Gray has moved for transfer to the Western District of Oklahoma under Rule 21(b). He has also moved for severance under Rule 14.

Defendant Linn has moved for transfer to the Western District of Oklahoma and for severance.

The Government and defendant Clark strongly oppose both transfer and severance. Defendant Clark urges that he should be tried with certain of the other defendants—particularly the accountants —on whom he relied in connection with the transactions in question. As to the transfer question, Clark asserts that he has been subjected to adverse publicity in the Western District of Oklahoma which might impair his ability to obtain a fair trial.

*Motion to Dismiss for Improper Venue*

██ As already indicated, defendants Wahrman, Bolka and Madole have moved to dismiss the substantive 10(b) counts, Counts 2–34, on the ground that venue does not lie in the Southern District of New York. This motion is denied.

The indictment contains sufficient allegations to indicate that the Southern District of New York is *one* of the districts where venue is proper for Counts 2–34. The introductory paragraphs to these counts allege in general the employment by defendants of manipulative and deceptive devices and contrivances, and allege that this was done "in the Southern District of New York and elsewhere." These counts incorporate by reference Paragraph 14 of Count 1 which alleges in some detail the means by which the fraud was allegedly generated and carried out—the creation of Four Seasons and the other corporations, the preparation and certification of the false financial statements, the alleged fraudulant intercorporate transactions, etc. Oddly enough, Paragraph 14, which covers some eight pages of the indictment, says nothing about where these alleged acts took place. However, in the general introductory paragraph to Count 1, there is the statement that the conspiracy alleged in that count took place "in the Southern District of New York and elsewhere." Counts 2–34 after incorporating Paragraph 14 from Count 1, go on to allege that "in the Southern District of New York" defendants used and caused to be used means and instrumentalities of interstate commerce and the mails. Counts 2–17 allege that defendants were guilty of "sending or causing to be sent" various purchase confirmations for Four Seasons stock from New York to certain specified organizations and individuals in New York and in other states. Counts 18–34 allege that defendants were guilty of "causing orders to purchase Four Seasons stock to be transmitted by wire to the Southern District of New York for execution on the American Stock Exchange." There follows a list of orders allegedly transmitted from specified organizations and individuals in various states.

Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, provides:

"Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred."

Also applicable is 18 U.S.C. § 3237(a), which provides:

"§ 3237. *Offenses begun in one district and completed in another*

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves."

Defendants Wahrman, Bolka and Madole argue that the alleged scheme to defraud occurred in the Western District of Oklahoma, where Four Seasons had its headquarters and where most of the relevant transactions, including the audit work of the Arthur Andersen & Co. accountants, took place. The Government responds that "there is no factual basis for the claim that the fraudulent scheme was solely in Oklahoma." The Government also argues that there are more than enough jurisdictional contacts with the Southern District of New York—simply the mailings of written confirmations, use of American Stock Exchange facilities, mailing of false earnings reports, and telephone calls.

Both sides refer to United States v. Cashin, 281 F.2d 669 (2d Cir. 1960). That case involved an indictment under both the 1933 Act and the 1934 Act, charging a fraudulent scheme formed and in large measure executed in Mobile, Alabama. The indictment also charged that for the purpose of executing the fraud a letter confirming the purchase of certain common stock was mailed from the Southern District of New York to a purchaser residing in New York. Judge Cashin ordered that the case be transferred to the Southern District of Alabama under Criminal Rule 21(b).[1] The Government sought to reverse this ruling by a petition for mandamus. The petition was denied by the Court of Appeals.

In considering the *Cashin* case, we must distinguish between what it states regarding the statutory venue requirements, and what it holds regarding the discretionary power of transfer under Rule 21(b). On the venue question, I read *Cashin* to indicate that the crime charged was "committed" both in Alabama and New York, and that venue was proper in both districts under 18 U.S.C. § 3237(a), which provides that an offense "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

As already noted, Counts 2–34 of the indictment in the present case charge in general the commission of the alleged illegal acts "in the Southern District of New York and elsewhere" and charge specific mailings and wiring of orders to and from the Southern District of New York. In my view this is sufficient to sustain venue in this district.

*Motion to Transfer Under Rule 21(b)*

Defendants Gray, Wahrman, Bolka, Madole and Linn move for transfer to the Western District of Oklahoma under Criminal Rule 21(b). The Government and defendant Clark oppose transfer. Defendants McCollum and Miller have

1. At the time of the *Cashin* case, Rule 21(b) authorized transfer only to another district "in which the commission of the offense is charged." In 1966 the rule was amended to eliminate this limitation.

not moved for transfer, nor have they come forward with any opposition to transfer.

■ The motions of defendants Gray, Wahrman, Bolka, Madole and Linn are granted and the action is severed and transferred to the Western District of Oklahoma as to them. The action as to defendants Clark, McCollum and Miller will remain in the Southern District of New York.

Criminal Rule 21(b) provides:

"(b) *Transfer in Other Cases.* For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district."

Some of the basic criteria to be considered on a Rule 21(b) motion are set forth in Platt v. Minnesota Mining & Manufacturing Co., 376 U.S. 240, 243–244, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). That case dealt with a corporate defendant, but the considerations obviously apply to individual defendants. These factors are (1) location of defendants; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) possible disruption of defendants' business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district involved.

■ These factors weigh heavily in favor of having this action tried in Oklahoma City, Oklahoma, which is the situs of the United States District Court for the Western District of Oklahoma.

Defendants Clark, Wahrman, Bolka, Madole and Linn reside in Oklahoma City. Defendant Gray resides in Wichita Falls, Texas—135 miles from Oklahoma City. Defendant McCollum resides in Scottsdale, Arizona, and defendant Miller resides in Glendale, Illinois. None of the defendants reside in New York.

The indictment and the bill of particulars name a total of 15 alleged co-conspirators. Three of these are the corporations which are central to the issues in the case—Four Seasons, Equity and Franchise. All three corporations originated in Oklahoma City and had their principal places of business there. None of these corporations ever had any office in New York.

Also named as a co-conspirator is the accounting firm of Arthur Andersen & Co. The auditing work in question was handled mainly by the Oklahoma City office of that firm.

Also named as a co-conspirator is Walston & Company. The Chicago office of that firm mainly handled the investment banking matters involved in this case.

Ten individuals are named as co-conspirators. Seven of these (Jennings, Brown, Johnson, Kilfoy, Hunt, Hambrick, and Beasley) live in Oklahoma City. One (Bouse) is now deceased, but formerly lived in Oklahoma City. One (Russell) lives in Florida. Only one (Crimmins) lives in New York State.

As to the events which will be in question, the center of gravity is clearly in Oklahoma. The conception and organization of Four Seasons took place in Oklahoma. Its business of building, selling, and operating nursing homes went beyond Oklahoma, but was carried on principally in the Middle West and Southwest. There is no indication that any of this business was done in New York.

Some of the most important allegations in the indictment relate to the creation of Four Seasons Equity Corporation. This corporation was conceived and organized in Oklahoma. The charge in the indictment is that Four Seasons dominated and controlled Equity, and that Four Seasons created fictitious construction profits by fraudulent sales of nursing homes to Equity. The transactions involving the alleged control of Equity by Four Seasons obviously took place mainly in Oklahoma. The three

top officers of Equity (Jennings, Brown and Johnson), who were named as co-conspirators, and who would appear to be important witnesses at the trial, were Oklahoma City businessmen at the time of the transactions in question and still reside in Oklahoma City. The bill of particulars specifies 25 nursing homes involved in the alleged fraudulent sales between Four Seasons and Equity. Eighteen of these were located in Texas; one in Arizona; one in Nevada; four in Illinois; and one in Kansas.

As far as the alleged illegal transactions involving Four Seasons and Equity, there is no indication that any of the important events took place in or near New York.

Another charge in the indictment is that defendants Clark and Gray made fraudulent sales of nursing homes to Four Seasons, and that the financial statements for fiscal 1968, which were audited by Arthur Andersen & Co. and defendant Wahrman, were false and misleading. It is clear that most of the transactions involved in these allegations occurred in or near Oklahoma. The bill of particulars specifies seven nursing homes involved. Five of these were in Oklahoma, two were in New Mexico.

Another crucial allegation of the indictment is that in connection with the June 30, 1969 financial statements of Four Seasons, $3 million in false construction costs were used in the calculation of profits. It is alleged that both the Four Seasons officers and the Arthur Andersen accountants participated in this fraud. There is no indication that any of the activities as to the generation or creation of this alleged fraud occurred in or near New York. The preparation and auditing of the financial figures was centered in Oklahoma City, although inspections and confirmations apparently took place with regard to specific nursing homes which were under construction, and with regard to various suppliers of equipment and materials for use in the construction of these homes. In the bill of particulars the Government has listed the nursing homes to which the false costs were allegedly allocated. Nineteen of these were in Texas; ten were in Illinois; the rest were in various locations in the Middle West and South West. As to the suppliers to whom alleged false costs were created, eight were located in Oklahoma; four in Colorado; three in Texas; three in Illinois; two in Ohio; and one each in Arizona, Kansas, Michigan and West Virginia.

An important phase of the case will obviously deal with the transactions relating to Four Seasons' public financings and its other dealings with its investment bankers, Walston & Co. But it appears clear that the relevant events in this regard were centered in Oklahoma City and Chicago. As already stated, it was the Chicago office of Walston & Co. which handled the Four Seasons matter. Walston's attorneys with respect to the Four Seasons' financings were a Chicago law firm. Four Seasons retained counsel both in Oklahoma City and in Chicago with respect to financing matters.

The Government points to the fact that the stock of Four Seasons was listed on the American Stock Exchange in New York. In Count 1 of the indictment the Government lists 13 alleged overt acts occurring in the Southern District of New York. These apparently relate to meetings about the American Stock Exchange listings; speeches to investor groups in New York City; and directions for the sale of Four Seasons stock belonging to certain of the defendants. It is interesting to note that no overt acts in New York are alleged as to the accountant defendants—Wahrman, Bolka and Madole.

I have no doubt that during the history of Four Seasons certain activities were carried out in New York by the Four Seasons defendants and the Walston defendants. This is almost inevitable, considering the financial importance of New York City and the existence of the American Stock Exchange here. But it seems clear that the great majority of the events and transactions which

will be in question in the trial of this case—relating to the business of Four Seasons and the creation of the financial reports—occurred in Oklahoma, or other Middle Western locations.

As to the location of potential witnesses—what has already been said indicates a great deal on this subject. Obviously the defendants and co-conspirators are among the most important potential witnesses, and the situs of the critical events is quite likely to be the location of essential witnesses.

Counsel for the accountant defendants have listed, by name or classification, 52 potential witnesses of interest to these defendants. I find that this list is not exaggerated. Whether all these witnesses will actually be called is something yet to be determined. But the convenience factor should relate not only to the calling of witnesses, but to the process of interviewing and determining which witnesses should be called.

Of these 52 potential witnesses 35 are located in or near Oklahoma City; 7 in Illinois; 4 in Colorado; 2 in Texas; one in Kansas; one in West Virginia; one in Arizona. Only one is located in New York. Thus almost all of these potential witnesses live in Oklahoma, or at places more convenient to Oklahoma than to New York.

The Government has given a statement of the number of its potential witnesses. There are 54 "victim" witnesses —apparently the persons who purchased Four Seasons stock as alleged in Counts 2–55. Of these, 32 reside in New York and New Jersey, and only one resides in the Western District of Oklahoma.

It may be, for one reason or another, that the testimony of all of these 54 "victim" witnesses will not be necessary.[2] Or, considering the nationwide distribution of Four Seasons stock, it seems likely that victim witnesses can be located as near to Oklahoma City as to New York. In any event, I do not believe that the location of victim witnesses should weigh heavily on this transfer motion. The Government has conceded that the testimony of such witnesses would be relatively short and their preparation relatively easy.

Aside from the victim witnesses, the Government states that it has 75 "substantive" witnesses. But the Government concedes that about 30 of these will come from the Western District of Oklahoma. Only 20 are said to come from New York and other East Coast locations, such as Washington and Boston. Chicago is said to be the location of 10. The location of the remaining 15 is not specified.

The Government has not fully indicated the character of the New York and East Coast witnesses, except to indicate that some of them will be from the American Stock Exchange, and some will be brokers and analysts who will testify as to false information disseminated to them. Apparently this group will also include certain experts.

I must conclude that the kind of witnesses which the Government places in or near New York are *not* generally those who can testify about the really essential issues in this case—the business of Four Seasons and the other corporations, the planning of financings, the preparation of financial reports, etc. It is clear that almost all of the potential witnesses on the latter issues reside in Oklahoma, or much closer to Oklahoma than to New York. Very few of such witnesses live in New York.

It is stated without contradiction that the S.E.C. investigation into the affairs of the Four Seasons companies was guided and controlled by the Fort Worth, Texas office of the S.E.C., and that at least 75% of the witnesses who appeared before the S.E.C. resided in or near the Western District of Oklahoma.

As to the location of documents, it appears that most of the relevant docu-

---

2. Certain of the defendants have moved for consolidation of Counts 2–55 into a few basic counts. These motions await decision by the judge or judges who have responsibility following determination of these transfer motions.

ments have already been brought to New York from Oklahoma City and other places where they originated. But this is hardly a weighty factor. The documents can be transported back.

The moving defendants urge that the inevitably lengthy trial of this case in New York would seriously disrupt them in carrying out various personal, family and business obligations. Predictions about the length of the trial vary. The Government says two months. Other estimates are four to six months. In any event the trial will be a long one.

Family and business life is disrupted by a criminal trial no matter where the trial takes place. But the disruption is obviously increased by a long trial far away from home. Defendant Linn makes a particularly strong plea in this regard, asserting that he is in extremely difficult economic circumstances and is now trying to build up his law practice, which he had given up to join Four Seasons Franchise Centers in early 1969. Linn states that an absence of several months for a trial of this action in New York would drastically impair his ability to recover financially, and would threaten him with insolvency.

Perhaps the ultimate consideration—flowing largely from what has already been set forth—relates to the ability or inability of the parties to handle this case · effectively and economically—in New York or Oklahoma. Those defendants moving for transfer assert that defense of this action in New York is beset by severe and unwarranted obstacles. I agree. The issues in this case are complex. Much analytical work with documents and witnesses is necessary. It is obviously difficult for a New York lawyer to handle this work effectively with the documents in New York and most of the witnesses 1500 miles away.

I do not say that the problems are insurmountable. The Government and defendant Clark are perfectly willing to undertake the task in New York. But they both have trial counsel with much longer background in this matter than is possessed by some of the other trial counsel. In any event, I find that the moving defendants are entitled to object to proceeding with this action in New York. To require them to do so would impose undue burden and difficulty. In this connection I note that, upon the transfer of the action to Oklahoma, both defendants Gray and Linn intend to discharge their New York attorneys and be represented solely by Oklahoma attorneys, thus reducing their expenses substantially.

As to the docket conditions of the two courts, I have no indication that the Western District of Oklahoma is unable to provide a reasonably prompt trial, although some limited delay may be inevitable simply because of the transfer.

It is interesting to note the decision of The Judicial Panel on Multidistrict Litigation of May 26, 1971 with regard to consolidation and transfer of pre-trial proceedings in ten civil actions brought against Four Seasons and others. Five of the actions had been brought in the Southern District of New York. Only one had been brought in the Western District of Oklahoma. The Panel ordered transfer under 28 U.S.C. § 1407 to the Western District of Oklahoma. The Panel stated:

"We conclude that the Western District of Oklahoma is the most desirable transferee forum. It is true that some of the prospective witnesses are brokers, analysts, underwriters, and customers who are engaged in business in New York. But the central legal question is the defendants' liability and the common areas of discovery will center on the conduct of the defendants during the registration, issuance, and sale of the securities. The principal defendants, the officers, and directors of the Four Seasons companies, are for the most part Oklahoma residents. Those residing elsewhere can travel to Oklahoma as easily as to New York."

The Panel also noted that the Chapter X reorganization for the Four Seasons

companies was in the Western District of Oklahoma.[3]

Of the various judicial decisions on the subject of transfer under Rule 21(b), I believe that the case most closely in point is United States v. Olen, 183 F.Supp. 212 (S.D.N.Y.1960), which led to the United States v. Cashin mandamus decision of the Court of Appeals, 281 F.2d 669 (2nd Cir. 1960), which I referred to earlier in this opinion. Both Judge Cashin and the Court of Appeals relied on the policy expressed in the Constitution and the Bill of Rights, providing that the trial of crimes is to be held where the crime has been committed. Both Judge Cashin and the Court of Appeals cited the Supreme Court decision in United States v. Johnson, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236 (1944). I believe that the following statement from United States v. Johnson is a guide in the present case, and indicates the strong desirability of granting the motion for transfer as to those defendants seeking such transfer.

"Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers wrote into the Constitution that 'The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . .' Article III, § 2, cl. 3. As though to underscore the importance of this safeguard, it was reinforced by the provision of the Bill of Rights requiring trial 'by an impartial jury of the State and district wherein the crime shall have been committed.' Sixth Amendment. By utilizing the doctrine of a continuing offense, Congress may, to be sure, provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates. Thus, an illegal use of the mails or of other instruments of commerce may subject the user to prosecution in the district where he sent the goods, or in the district of their arrival, or in any intervening district. Plainly enough, such leeway not only opens the door to needless hardship to an accused by prosecution remote from home and from appropriate facilities for defense. It also leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution.

These are matters that touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests. These are important factors in any consideration of the effective enforcement of the criminal law. They have been adverted to, from time to time, by eminent judges; and Congress has not been unmindful of them. Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed." United States v. Johnson, 323 U.S. at 275–276, 65 S.Ct. at 250–251.

Although the action is to be transferred to the Western District of Oklahoma as to the moving defendants (Gray, Wahrman, Bolka, Madole and Linn), it is *not* to be transferred as to Clark, who opposes transfer. The same is true for McCollum and Miller, who have not requested transfer.

Rule 21(b) provides for transfer only "upon motion of the defendant" and that the transfer shall apply only "as to him." The cases which have discussed the point have held that the rule does not authorize transfer, in a multi-defendant case, as to defendants who do not move or who object to transfer. Yeloushan v. U. S., 339 F.2d 533, 536–537 (5th Cir. 1964); United States v. Choate, 276 F. 2d 724, 727 (5th Cir. 1960); United States v. Corallo, 281 F.Supp. 24, 26 (S. D.N.Y.1968); United States v. Jessup, 38 F.R.D. 42, 49–50 (M.D.Tenn.1965); United States v. Parr, 17 F.R.D. 512,

3. The Chapter X reorganization proceedings have now been concluded, and a re- organized corporation, based in Oklahoma City, is carrying on business.

518–519 (S.D.Tex.1955); United States v. Erie Basin Metal Products Co., 79 F. Supp. 880, 882 (D.Md.1948).

Both Clark and the Government urge that this Court has no authority to transfer a criminal action as to a non-moving defendant. In view of these circumstances, the action will remain in the Southern District of New York as to defendants Clark, McCollum and Miller.

■ The Government argues strongly that the inability to transfer as to non-moving defendants means that there should be no transfer as to *any* defendants. The Government points out that the division of the case will result in two lengthy trials and much unnecessary duplication of effort because of the common issues involved.

In my view this problem is outweighed by the strong considerations of fairness with respect to those seeking transfer. In any event the situation the Government now faces was brought about by its own questionable decision to prosecute this case in a district remote from most of the events and persons involved.

If the Government in fact wishes to avoid duplicate trials, it could well consider the possibility of trying to reindict Clark in the Western District of Oklahoma and consolidating the proceedings there. See United States v. Erie Basin Metal Products Co., 79 F.Supp. 880, 886 (D.Md.1948).

*Motions for Severance*

The accountant defendants—Wahrman, Bolka and Madole—have moved for severance and separate trial on the ground that there are substantial issues unique to them and not common to the other defendants. Defendants Gray and Linn have each moved for severance and separate trials as to themselves.

■ These, of course, are the defendants as to whom I am granting transfer to the Western District of Oklahoma. I believe that the transferee court should have the opportunity to decide the method of trial with respect to these defend-ants and the questions of severance which they raise among themselves. Therefore I am not undertaking to determine these severance motions.

As to the severance of Clark, McCollum and Miller from the other defendants, this severance is solely for the purpose of effectuating the transfer of the other defendants. I am not making any judgment as to any other factors relevant to questions of severance.

*Conclusion*

The motion of defendants Wahrman, Bolka and Madole to dismiss Counts 2–34 for improper venue is denied.

The motions of defendants Gray, Wahrman, Bolka, Madole and Linn for transfer of this action as to them to the United States District Court for the Western District of Oklahoma are granted. In order to effectuate that transfer severance is granted as to these defendants.

So ordered.