481 F.2d 276
 Fed. Sec. L. Rep. P 93,978
UNITED STATES of America, Petitioner,
v.
Honorable Thomas P. GRIESA, United States District Judge, Respondent.
UNITED STATES of America,
v.
Jack L. CLARK et al., Defendants.
 No. 919, Docket 73-1544.
 United States Court of Appeals,
Second Circuit.
 Argued April 19, 1973.
Decided May 4, 1973.
 
 Whitney North Seymour, Jr., U. S. Atty., New York City (John W. Nields, Jr., Gary P. Naftalis, Robert G. Morvillo, Richard J. Davis, Shirah Neiman and Ira Lee Sorkin, Asst. U. S. Attys., New York City, on the brief), for petitioner.
 
 
 1
 Arthur F. Mathews, Wash., D. C., for defendant Clark.
 
 
 2
 Peter E. Fleming, Jr., New York City, for defendants Wahrman, Bolka and Madole.
 
 
 3
 Robert P. Patterson, Jr., New York City, for defendant Gray.
 
 
 4
 Ralph Wienshienk, New York City, for defendant Linn.
 
 
 5
 Before HAYS, SMITH and TIMBERS, Circuit Judges.
 
 PER CURIAM:
 
 6
 On December 20, 1972, a 65 count indictment was returned in the Southern District of New York charging the eight defendants named in the caption of this case with violations of the antifraud provisions of the federal securities laws, the provisions of the federal securities laws proscribing the filing of false financial statements and the mail fraud statute, and with conspiracy to violate the said statutes.
 
 
 7
 On January 8, 1973, defendants Miller and McCollum pled guilty to four counts of the indictment. The remaining six defendants pled not guilty to those counts in which they were named. The case was scheduled for trial beginning May 1, 1973 in the Southern District of New York before Thomas P. Griesa, District Judge.
 
 
 8
 On March 30, upon motion of defendants Wahrman, Bolka, Madole, Gray and Linn-and over the opposition of the government and defendant Clark-Judge Griesa ordered the action transferred, as to the five moving defendants, to the United States District Court for the Western District of Oklahoma, pursuant to Fed.R.Crim.P. 21(b). The judge severed the action as to the moving defendants in order to effectuate the transfer. This results in the action as against defendant Clark to be tried in the Southern District of New York; and the action as against the five moving defendants to be tried in the Western District of Oklahoma.
 
 
 9
 On April 12, the government filed the instant petition for a writ of mandamus seeking the following relief:
 
 
 10
 (1) That Judge Griesa be directed to vacate the order transferring the action as to the five moving defendants to the Western District of Oklahoma; and
 
 
 11
 (2) That the Chief Judge of the Southern District of New York designate another judge to preside over the trial of the instant action.
 
 
 12
 On April 19, we heard oral argument by counsel for the government and by counsel for each of the six defendants awaiting trial.
 
 
 13
 After due consideration, we have decided that the petition for a writ of mandamus should be denied and it is so ordered.
 
 
 14
 We start from the proposition that mandamus is an extraordinary writ "reserved for really extraordinary causes." Ex parte Fahey, 332 U.S. 258, 260, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947). As we recently noted, the writ may be used only "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so," Hilbert v. Dooling, 476 F.2d 355 (2d Cir., 1973) (en banc) (quoting from Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 87 L.Ed. 1185 (1943)). See also SEC v. Stewart, 476 F.2d 755 (2d Cir., 1973). The government does not seriously contend that the district court acted outside its jurisdiction here; at most, we are urged to correct what petitioner conceives to be an incorrect decision. We do not view this as an appropriate use of the extraordinary writ. SEC v. Stewart, supra.
 
 
 15
 Moreover, as the Supreme Court has warned us in Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L. Ed.2d 305 (1967), the usual reluctance to allow appeal of interlocutory orders through mandamus should be even more applicable in the context of criminal cases. The Court noted that it had "never approved the use of the writ to review an interlocutory order in a criminal case which did not have the effect of dismissal." Id. at 9. To be sure, the Court then left open the possibility that wider use of the writ might be permissible. But that still leaves the petitioner here in the position of asking us to break new ground. It is difficult to conceive that a transfer order under Fed.R.Crim.P. 21(b) could ever provide the occasion for such a jump forward;[1] in this case, at least, we decline the gambit.[2]
 
 
 16
 Referring to the second item of relief sought in the government's petition for mandamus as set forth above, we believe in fairness and in the public interest it should be stated that nothing in the record before us would justify our ordering, or recommending that the Circuit Council order, that another judge be designated to preside over the trial of this action. We are confident that Judge Griesa is fully competent to do so.
 
 
 17
 Petition for writ of mandamus denied.
 
 
 18
 TIMBERS, Circuit Judge (concurring in part and dissenting in part):
 
 I.
 
 19
 I concur with the majority's refusal to order, or to recommend that the Circuit Council order, that a judge other than Judge Griesa be designated to preside over the trial of this action. The relief sought by the government in this respect is based chiefly on what Judge Griesa candidly concedes to have been his lack of experience in criminal matters before entering upon his duties as a district judge on September 22, 1972, and his limited experience while on the bench in having tried but one criminal case to a conclusion. Whatever may be the merits of the government's suggestion that the Circuit Council should give attention to the operation of the present random system of assigning complex criminal cases,[1] I agree with the majority that on the present record this is not a matter properly within the mandamus power of this Court. And I share the confidence of my colleagues in Judge Griesa's competence to preside over the trial of this action.
 
 II.
 
 20
 With the utmost deference to my colleagues, however, I respectfully dissent from the denial of the petition for a writ of mandamus. My dissent is based chiefly on the ground that the transfer order of the district court which results in the bifurcation of a massive securities fraud prosecution-necessitating two separate, delayed, lengthy and expensive trials, one in the Western District of Oklahoma and one in the Southern District of New York-is so clearly not "in the interest of justice"[2] as to constitute an abuse of discretion which should be corrected by our issuance of a writ of mandamus.
 
 
 21
 (A)
 
 
 22
 As for the mandamus jurisdiction of our Court to review the transfer order of the district court, I am satisfied that we have such jurisdiction pursuant to the supervisory mandamus doctrine. LaBuy v. Howes Leather Co., 352 U.S. 249, 259-60 (1957); Schlagenhauf v. Holder, 379 U.S. 104, 110-11 (1964); SEC v. Stewart, 476 F.2d 755, 763-66 (2 Cir. 1973) (dissenting opinion of Timbers, J.), and authorities there cited.
 
 
 23
 The principles to be applied in determining whether a writ of mandamus should issue are basically the same whether the underlying action is civil or criminal. United States v. Dooling, 406 F.2d 192, 198-99 (2 Cir. 1969), cert. denied sub nom. Persico v. United States, 395 U.S. 911 (1969); United States v. Nebbia, 357 F.2d 303, 305 (2 Cir. 1966). Where a district court acts in excess of its authority or clearly abuses its discretion, an appellate court will grant the writ at the behest of an aggrieved party. Miller v. United States, 403 F.2d 77, 78-81 (2 Cir. 1968); SEC v. Stewart, supra, 476 F.2d at 763-66, and cases cited at 765.
 
 
 24
 In Will v. United States, 389 U.S. 90 (1967), the Supreme Court indicated that "additional considerations" are involved in deciding whether to grant the writ where the government seeks it in a criminal case. These additional considerations essentially are the policies represented by the speedy trial and double jeopardy provisions of the United States Constitution.[3] 389 U.S. at 96. But the presence of these considerations does not mean that the government will never be successful in seeking the writ. In Will, the Court suggested that some, but certainly not all, uses of the writ of mandamus can be called forms of "appeals" and thus subject to the rule of construction prohibiting government appeals not strictly authorized by statute. The Court stated that historically it had "never approved the use of the writ to review an interlocutory procedural order in a criminal case which did not have the effect of a dismissal." 389 U.S. at 98. This might be taken to indicate that writs to review interlocutory procedural orders are deemed by the Court to be equivalent to appeals. As a logical matter, however, the Court obviously did not mean this. Reviewing an interlocutory procedural order on mandamus is no more similar to an appeal than is reviewing a dismissal on mandamus. Also, later in the opinion, the Court indicated that its greater concern was with the use of the writ for supervisory purposes:
 
 
 25
 "We note in passing that La Buy and the other decisions of this Court approving the use of mandamus as a means of policing compliance with the procedural rules were civil cases. See Schlagenhauf v. Holder, 379 U.S. 104 (1964); McCullough v. Cosgrave, 309 U.S. 634 (1940); Los Angeles Brush Mfg. Corp. v. James, 272 U.S. 701, 706, 707 (1927) (dictum). We have pointed out that the fact this case involves a criminal prosecution has contextual relevance. See supra, at 96-98. In view of our reading of the record, however, we need not venture an abstract pronouncement on the question whether this fact imposes a more stringent standard for the invocation of mandamus by the Government where the allegation is that a district judge has deviated from the federal rules." 389 U.S. at 100 n. 10.
 
 
 26
 What the Court appears to have meant by its earlier statement was that the policy against prosecutorial harassment through prolonged or repeated trial weighs heavily against review on mandamus of interlocutory procedural orders unless they have the effect of a dismissal. But this does not preclude issuance of the writ in an appropriate case where the need to correct an erroneous interlocutory order overrides the policy against prosecutorial harassment. Indeed, the Court expressly stated that it was leaving that possibility open:
 
 
 27
 "We need not decide under what circumstances, if any, such a use of mandamus would be appropriate. It is enough to note that we approach the decision in this case with an awareness of the constitutional precepts that a man is entitled to a speedy trial and that he may not be placed twice in jeopardy for the same offense." 389 U.S. at 98.
 
 
 28
 Indeed, it has long been recognized that the writ will issue to correct gross errors in criminal cases at the behest of the government. E. g., United States v. Smith, 331 U.S. 469 (1947); Ex parte United States, 287 U.S. 241 (1932); Ex parte United States, 242 U.S. 27 (1916); United States v. Mayer, 235 U.S. 55 (1914); United States v. Lasker, 481 F.2d 229 (2 Cir. 1973). Such use of the writ is consistent with its recognized function to maintain the integrity and efficiency of our judicial system. United States v. United States District Court, 444 F.2d 651 (6 Cir. 1971), aff'd, 407 U.S. 297, particularly at 301 n. 3 (1972); United States v. Hughes, 413 F.2d 1244, 1247 (5 Cir. 1969), vacated as moot sub nom. United States v. Gifford-Hill-American, Inc., 397 U.S. 93 (1970). Accordingly, where issuance of the writ is proper under the general mandamus standards, it should issue upon the petition of the government if the necessity to correct an abuse of discretion by a district judge outweighs the impingement of such policies as those reflected by the double jeopardy and speedy trial provisions of the Constitution. United States v. Dooling, supra, 406 F.2d at 198-99.
 
 
 29
 In determining whether our mandamus power should be exercised here, the essential question is whether this is a sufficiently unusual and compelling case to warrant our intervention to review the transfer order of the district court. I think it is.
 
 
 30
 (B)
 
 
 31
 It is difficult for me to perceive a clearer abuse of discretion[4] than the transfer order of the district court below-all else aside,[5] because it results in the bifurcation of this massive securities fraud case, necessitating separate trials in the Western District of Oklahoma[6] and the Southern District of New York.
 
 
 32
 The fraud charged in the indictment arose out of the financial collapse of Four Seasons Nursing Centers of America, Inc., a publicly held corporation engaged in the construction and operation of nursing homes and health care facilities.[7] Defendants are charged with having utilized fraudulent devices in various financial statements, registration statements and prospectuses. These were filed with the SEC and the American Stock Exchange. They caused the earnings of Four Seasons to appear greatly in excess of what they actually were. The stock was touted by the insiders. Defendants sold to the public substantial amounts of newly issued stock, together with large quantities of their personally owned stock. The stock was sold at enormously inflated prices by the insiders and through the marketing efforts of Walston & Co., the broker for Four Seasons. Substantially all of this activity took place in New York and other financial centers of the United States-not in Oklahoma.
 
 
 33
 The net result, according to the government, was a loss to public investors of close to $200 million; illegal personal profits to defendants and their co-conspirators of more than $21 million; defrauding the State of Ohio on a $4 million loan; and defrauding European investors of $15 million worth of debentures. We are told that the case represents one of the most important criminal cases presently pending in the Southern District of New York, and one of the most massive securities fraud prosecutions ever undertaken during the four decades since Congress enacted the original federal securities laws.
 
 
 34
 The indictment which was returned in the Southern District of New York on December 20, 1972 resulted from a ten month investigation by a special grand jury in that district and by the United States Attorney's office in that district. During the ensuing four month period, 25 separate motions were filed by defendants, including motions for a bill of particulars, discovery, dismissal of the indictment and change of venue. The government on March 16 filed a 26-page bill of particulars pursuant to the court's order. The court also ordered extensive discovery and inspection of 35 file cabinets of documents in the government's possession-first on a 24 hour, later reduced to a 14 hour, 7 day week basis. The court has ruled that the May 1 trial date is a firm one, having refused as recently as April 10 to grant a one month continuance upon the joint application of the government and defendant Clark. It is estimated that the trial will require two to six months.
 
 
 35
 The court's order of March 30 transferring the case as to five of the six defendants to the Western District of Oklahoma was over the opposition of the government and defendant Clark. The latter opposed the motion on the ground he was entitled to a joint trial with the other defendants in the Southern District of New York where all defendants had been indicted, and on the further ground that he could not obtain a fair trial in the Western District of Oklahoma where there had been extensive pre-trial publicity.[8]
 
 
 36
 The effect of the district court's transfer order, as the government points out, is to require two separate trials of this massive securities fraud case in two widely separated districts, whereas only one would have been required before. This means substantial duplication of time, effort and money with respect to judicial manpower, government counsel and investigators, defense counsel and investigators, witnesses and numrous court personnel. From the standpoint of witnesses alone, the inconvenience of being required to testify at two separate trials, 1500 miles apart, is enormous. In addition to the 52 potential witnesses which certain of the defendants anticipate calling, the government plans to call 54 victim witnesses (32 of whom are named in the indictment and reside in the New York area), plus 75 other witnesses (20 of whom reside on the East Coast). Aside from the location of the witnesses, the critical point is that most of the 129 government witnesses will be required to testify at two separate trials. On this score alone, the transfer order can hardly be said to be "[f]or the convenience of . . . witnesses." Rule 21(b).
 
 
 37
 The bifurcation of the case will cause a delay in the trial of the Western District of Oklahoma segment for an estimated period of at least nine months to a year. This results from several factors. Two of the five transferred defendants who made the motion to transfer have announced that they will have to retain new counsel. The judge to whom the case is assigned in the transferee court will need time to familiarize himself with the case and to rule upon additional motions. And the government understandably will have to complete the two to six month trial of the New York segment of the case (where the 35 file cabinets of documents are located) before it can proceed to trial in Oklahoma. Such delay in the disposition of a major criminal case, far from being "in the interest of justice", strikes me as being squarely contrary to the settled policy of our Court, as expressed through our Circuit Council, regarding the prompt disposition of criminal cases.[9]
 
 
 38
 In fairness to the district court, it did recognize the problems created by its bifurcation of this case. It noted in its opinion that "[t]he Government points out that the division of the case will result in two lengthy trials and much unnecessary duplication of effort because of the common issues involved." 360 F.Supp. at 946. The district court then responded to this claim on essentially two grounds:
 
 
 39
 (1) "[T]he situation the Government now faces was brought about by its own questionable decision to prosecute this case in a district remote from most of the events and persons involved"; and
 
 
 40
 (2) "If the Government in fact wishes to avoid duplicate trials, it could well consider the possibility of trying to reindict Clark in the Western District of Oklahoma and consolidating the proceedings there." Id. at 946.
 
 
 41
 In my view-on the critical issue of whether the transfer was "in the interest of justice"-the district court's response demonstrates a complete misapprehension of the joint responsibility of the Securities and Exchange Commission and the Department of Justice in determining the appropriate venue for a criminal securities fraud case such as the instant one; and a similar misapprehension as to the indictability of defendant Clark in the Western District of Oklahoma.
 
 
 42
 Taking up the district court's misapprehensions in reverse order, it is simply not so that there is any "possibility of trying to reindict Clark in the Western District of Oklahoma" on the mail fraud counts (Counts 35-56) or on the false filing counts (Counts 63-65). Venue could not be laid in the Western District of Oklahoma with respect to those counts.[10] Hence, if this ground stated by the district court purporting to justify the transfer were to be accepted, it would "have the effect of a dismissal", Will v. United States, supra, 389 U.S. at 98, of the criminal proceeding against Clark with respect to 25 of the 65 counts. As for the other 40 counts against Clark, even if the government were to subbifurcate the case by reindicting Clark on these counts in the Western District of Oklahoma after a lengthy re-presentation of the evidence to a new grand jury there, it would be faced with the strong likelihood of a successful motion by Clark pursuant to Fed.R.Crim.P. 21(a) to have the case transferred back to the Southern District of New York because of the prejudicial pre-trial publicity in Oklahoma referred to above. And it should be noted that the transfer provided for in Rule 21(a) is mandatory, whereas a Rule 21(b) transfer is discretionary.
 
 
 43
 The other ground upon which the district court purported to justify its division of the case-namely, that "the situation the Government now faces was brought about by its own questionable decision to prosecute this case in [the Southern District of New York]"-represents an even more serious misapprehension of a most delicate and sensitive area of decision making which is entrusted by Congress to the executive branch of the government, here to the Securities and Exchange Commission and the Department of Justice.
 
 
 44
 Prior to the ten month special grand jury investigation which preceded the return of the instant indictment in the Southern District of New York, a series of administrative proceedings were undertaken for the purpose of determining whether criminal proceedings should be instituted and, if so, where. The statutory basis for the SEC's investigatory responsibility is found in Section 21(e) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78u(e) (1970), and Section 20(b) of the Securities Act of 1933, 15 U.S.C. Sec. 77t(b) (1970). Congress has granted to the SEC under each Act the authority to pursue two specific, non-exclusive courses of action with respect to violations of the Acts: (1) to institute a civil injunction enforcement proceeding; and (2) if the evidence warrants, to transmit a criminal reference report to the Attorney General leading to possible criminal proceedings. SEC v. Stewart, supra, 476 F.2d at 760.
 
 
 45
 Here, as the district court noted, the SEC investigation into the affairs of Four Seasons operated out of the SEC's regional office at Fort Worth, Texas. In view of the far-flung scope of the alleged fraud-throughout the United States and abroad-the investigative facilities of other SEC regional offices throughout the Country were utilized, including those in New York, Chicago and Los Angeles. The field investigation was authorized, coordinated and closely supervised by one or more of the SEC's operating divisions in Washington, D.C. under the aegis of the Commission itself. Ultimately the staff report of such field investigation was submitted to the appropriate operating division or divisions which, after consultation with the General Counsel's office, made certain recommendations to the Commission, including a recommendation as to whether civil or criminal proceedings, or both, should be instituted.
 
 
 46
 Since we know that criminal proceedings were instituted, they were recommended by a criminal reference report transmitted to the Department of Justice by the SEC pursuant to its statutory responsibility to "transmit such evidence as may be available concerning such acts or practices to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter." 15 U.S.C. Sec. 78u(e) (1970).[11] After certain staff work in the Department of Justice and ultimately upon the recommendation of its Criminal Division, the Attorney General, in his discretion, made a decision, first, that criminal proceedings should be instituted, and, second, that they should be instituted in the Southern District of New York. At that point, the prosecution was entrusted to the office of the United States Attorney for that district-an office which traditionally has been accorded a degree of autonomy unique among United States Attorneys' offices throughout the Country. There followed the ten month investigation by the special grand jury and the United States Attorney's office in the Southern District of New York which culminated in the return of the instant indictment on December 20, 1972.
 
 
 47
 Far from reflecting a "questionable decision to prosecute this case" in the Southern District of New York, as the district court below thought, the decision on the contrary resulted from the exercise of the joint responsibility entrusted by Congress to the SEC and the Department of Justice and reflected a delicately calibrated balance between many competing considerations, including the proper interests of the defendants, of the government and-not to be overlooked-of the defrauded public investors, i. e., "by resolving doubts in favor of those the statute is designed to protect". Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 (1970). While Rule 21(b) does grant discretionary power to the district court to transfer a criminal case in the interest of justice (a showing required in addition to the convenience of parties and witnesses), I think that district judges would be well advised to heed the admonition of one of the wisest and most experienced district judges in the entire federal system that "[a]s a general rule a criminal prosecution should be retained in the original district." United States v. United States Steel Corp., 233 F.Supp. 154, 157 (S.D.N.Y.1964) (Weinfeld, J.).
 
 
 48
 In short, I believe that the transfer order of the district court here which results in the bifurcation of a massive securities fraud prosecution is not in the interest of justice and constitutes a clear abuse of discretion.
 
 III.
 
 49
 In addition to the importance of our granting a writ of mandamus to correct the district court's abuse of discretion in the instant case, I regard the matter before us as transcending in importance even the issues of this particular case.
 
 
 50
 Hardly more than a glance at the headlines in the daily press is needed to indicate the inadvisability of unnecessary hobbling of those agencies of the United States government charged with the awesome responsibilities entrusted to them by Congress of enforcing the federal securities laws, including criminal prosecutions. In addition to the handicaps of limited budgets and staffs, to impose the further burden of two separate, delayed, lengthy and expensive trials in widely separated districts, where only one trial is necessary, is to strike at the jugular vein of effective law enforcement in one of the most critical areas of our economy. The precedent of the transfer order below, unless corrected, will cause mischief in the enforcement of the federal securities laws, indeed of all criminal laws. And the unfortunate radiations of this transfer order will have their impact beyond this Circuit.
 
 
 51
 This is precisely the extraordinary case for which the extraordinary writ of mandamus is reserved. I would issue the writ and remand the case to the district court, Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 246 (1964), for reconsideration of its transfer order in light of the considerations set forth above, including the appropriate criteria for determining whether the bifurcation of this massive securities fraud case is in the interest of justice. By so doing we would again affirm the strong policy of this Court in securities fraud cases of protecting the paramount public interest involved. See, e. g., Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 357-358, 386-387, 390 (2 Cir. 1973); Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc., 476 F.2d 687, 693, 698-99 (2 Cir. 1973); SEC v. Everest Management Corp., 475 F.2d 1236, 1240 (2 Cir. 1972); SEC v. Manor Nursing Centers, Inc. 458 F.2d 1082, 1100-06 (2 Cir. 1972).
 
 
 
 [1]
 Indeed, Professors Wright and Miller have commented that the 1966 amendments to Rule 21, which dropped the former emphasis on venue and allowed transfers to be made "For the convenience of parties and witnesses, and in the interest of justice," (emphasis added) "should eliminate any occasion for such use of mandamus." 1 C. Wright & A. Miller, Federal Practice and Procedure Sec. 347 at 648. Cf. 8 J. Moore, Federal Practice p 21.04
 
 
 [2]
 Nor do we think this an appropriate instance for the exercise of what has been termed supervisory mandamus. See LaBuy v. Howes Leather Co., 352 U.S. 249, 259-260, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). As we noted in SEC v. Stewart, supra, supervisory mandamus is particularly ill-suited as a method of policing district court decisions that turn on issues of fact, as is certainly the case here. Moreover, the same considerations that militate generally against use of the writ in criminal appeals arguably apply where supervisory mandamus is concerned. Cf. Will v. United States, supra, 389 U.S. at 100, n. 10, 88 S.Ct. 269
 
 
 [1]
 Wearing my hat as a member of the Circuit Council-not as a member of this panel on the instant mandamus petition-I believe there is substantial merit to the government's suggestion. Indeed, I know of no problem within the province of our Circuit Council of any greater urgency. See Report of the Proceedings of the Judicial Conference of the United States, Washington, D.C., October 28-29, 1971, which on October 29, 1971 adopted the report of its Committee On Court Administration (pp. 70-74), including the following:
 "There shall be established within each multi-judge court a screening system whereby all cases potentially presenting unusually difficult questions of law or procedure and which may require longer periods of time for disposition than so-called routine cases, or which by their inherent nature will require exceptional supervision, will be identified and assigned in accordance with the procedures herein set forth." Id. at 71.
 This recommendation of the Judicial Conference of the United States appears never to have been implemented by the District Court for the Southern District of New York. In my view, it should be without further delay.
 
 
 [2]
 The transfer order of the district court was entered pursuant to Fed.R.Crim.P. 21(b) which provides:
 "(b) Transfer in Other Cases. For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district." (emphasis added).
 
 
 [3]
 Many years ago these same considerations formed the basis for the still vital rule of construction that the government can take no appeal in a criminal case that is not provided for expressly by a federal statute. United States v. Sanges, 144 U.S. 310 (1892)
 
 
 [4]
 As we repeatedly have stated, the reference to "abuse of discretion" on the part of the district judge is not to be taken as any reflection upon the district judge personally. See SEC v. Stewart, supra, 476 F.2d at 759 n. 1. Cf. SEC v. Bangor Punta Corp., 480 F.2d 341, 386 n. 42 (2 Cir. 1973). Such term simply expresses the judicial standard to be invoked in determining whether the writ of mandamus should issue. My colleagues and I hold Judge Griesa in the highest esteem. The benchmark of a truly competent district judge-as with Judge Griesa in the instant case-is his capacity to insure that the record demonstrates with crystal clarity the basis of his exercise of discretion, so that a reviewing court can determine abuse of discretion or the absence thereof
 
 
 [5]
 As stated above, my dissent is based chiefly on the ground that the transfer order, in bifurcating this massive securities fraud case, is so clearly not "in the interest of justice", Fed.R.Crim.P. 21 (b), as to constitute an abuse of discretion
 With respect to the other Rule 21(b) grounds for transfer-"convenience of parties and witnesses"-it would appear from the record before us that the only factor that clearly points toward the Western District of Oklahoma as an appropriate forum is the convenience of the five moving defendants, four of whom reside in Oklahoma City and the fifth in Wichita Falls, Texas. (Defendant Clark, whose case remains to be tried in the Southern District of New York, also resides in Oklahoma City.) But we have held that where defendants in a criminal case have utilized a New York distributor (here, Walston & Co.) to sell stock to the public, "they can scarcely complain of a New York venue". United States v. Aronson, 319 F.2d 48, 52 (2 Cir.), cert. denied, 375 U.S. 920 (1963). See Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240 (1964) ("'home' of the respondent has no independent significance in determining whether transfer to that district would be 'in the interest of justice'," Id. at 245); Jones v. Gasch, 404 F.2d 1231, 1240 n. 43 (D.C.Cir. 1967), cert. denied, 390 U.S. 1029 (1968) ("we are unable to read out of [Platt's] broad language those defendants who are natural persons.")
 In any event, the district court did take into account the nine factors enumerated in Platt, supra, 376 U.S. at 243-44, as bearing on the propriety of a transfer. And while I doubt that the record would support a finding that the Western District of Oklahoma is clearly the more appropriate forum, all of the Platt factors considered, I recognize that in determining whether mandamus relief should be granted it would be improper for us to substitute our judgment for that of the district court in weighing the propriety of the two districts under consideration from the standpoint of the convenience of parties and witnesses.
 But the question of whether the bifurcation of this case is in the interest of justice is on quite a different footing so far as abuse of discretion is concerned-particularly in the light of certain of the district court's misapprehensions, referred to below, in stating its grounds purporting to justify the transfer.
 
 
 [6]
 Ironically, of the 96 districts in the United States, the one district singled out as the transferee district by defendants' motion to transfer is a district that has not been without its own problems regarding assignments. See Chandler v. Judicial Council Of The Tenth Circuit, 398 U.S. 74 (1970). Presumably, under Rule 21(b), the district judge to whom the transfer motion is addressed has no discretion in selecting the district to which the transfer is to be made; if there is to be a transfer at all, it must be to the district specified in the motion. Wright & Miller, Federal Practice and Procedure Sec. 345 (1969)
 Comparison of the judicial manpower and government personnel in the two districts would appear to be a factor bearing on the propriety of the transfer order. In the Western District of Oklahoma, there are 4 district judges and 7 Assistant United States Attorneys. In the Southern District of New York, there are more than 25 district judges and more than 90 Assistant United States Attorneys.
 The author of this opinion having served for more than ten years on a 4 judge district court, including seven years as chief judge, can take judicial notice of the enormous disruption that most assuredly will be caused in the transferee district by the transfer of this case. It will be about as welcome there as a six month dust storm on the prairie.
 
 
 [7]
 This fertile field for securities fraud is no stranger to this Court. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2 Cir. 1972)
 
 
 [8]
 Clark now appears to have partially changed his tune. His counsel at the argument of the mandamus petition before us supported the order of the district court which involves a separate trial of Clark in the Southern District of New York
 
 
 [9]
 See Statement of the Circuit Council to Accompany Second Circuit Rules Regarding Prompt Disposition of Criminal Cases:
 "The public interest requires disposition of criminal charges with all reasonable dispatch. The deterrence of crime by prompt prosecution of charges is frustrated whenever there is a delay in the disposition of a case which is not required for some good reason. The general observance of law rests largely upon a respect for the process of law enforcement. When the process is slowed down by repeated delays in the disposition of charges for which there is no good reason, public confidence is seriously eroded." 28 U.S. C.A. (Supp.1973).
 
 
 [10]
 The mail fraud counts (Counts 35-56) charge defendants with effectuating a fraudulent scheme through the use of the mails in violation of 18 U.S.C. Sec. 1341 (1970). Venue with respect to those counts can be laid only at the place of mailing, the place of receipt of the mail or the places through which the mailed matter passed. Hagner v. United States, 285 U.S. 427 (1932); Salinger v. Loisel, 265 U.S. 224 (1924); United States v. Cashin, 281 F.2d 669, 674 (2 Cir. 1960). All of the mailings alleged in Counts 35-56 of the instant indictment were mailed from New York to places in New York, New Jersey, Connecticut or Ohio. None was mailed from, to or through Oklahoma
 The false filing counts (Counts 63-65) charge certain defendants, including Clark, with filing a false listing application and false annual reports of Four Seasons with the American Stock Exchange and the Securities and Exchange Commission in violation of 15 U.S.C. Secs. 78l and 78m (1970). Venue with respect to those counts can be laid only "in the district wherein any act or transaction constituting the violation occurred". 15 U.S.C. Sec. 78aa (1970). The false documents having been filed in New York City and Washington, D.C.-not in Oklahoma-venue would be proper only in the Southern District of New York or the District of Columbia, not in the Western District of Oklahoma. See Travis v. United States, 364 U.S. 631, 636 (1961).
 
 
 [11]
 Section 20(b) of the Securities Act of 1933, 15 U.S.C. Sec. 77t(b) (1970), is substantially identical to Section 21(e) of the Securities Exchange Act of 1934, a portion of which is quoted in the text