UNITED STATES of America,

v.

Arnold ARONOFF, Jerome Castle and Edward J. Robinson, Defendants.

No. 78 Cr. 713 (JMC).

United States District Court,
S. D. New York.

Dec. 8, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y. by Thomas H. Sear and Robert S. Litt, Asst. U. S. Attys., New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Jay H. Topkis, New York City, for defendant Aronoff.

Saxe, Bacon & Bolan, P. C., New York City by Michael Rosen, New York City, for defendant Castle.

Edwards & Edwards, Detroit, Mich. by George C. Edwards, III, Detroit, Mich., for defendant Robinson.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Motion of defendant Arnold Aronoff, to transfer the instant proceedings against him to the United States District Court for the Eastern District of Michigan, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, is denied.

Motion of defendant Edward J. Robinson, to transfer the instant proceedings against him to the United States District Court for the Eastern District of Michigan, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, is granted.

## FACTS

There are three defendants in this case, Arnold Aronoff, Jerome Castle, and Edward J. Robinson. Aronoff and Robinson have moved under Rule 21(b) for a transfer of their trial to the Eastern District of Michigan, for the convenience of themselves and their witnesses, and in the interest of justice. Castle, however, has not moved for a transfer.

In support of his motion, Robinson avers, *inter alia,* that he lives and works in the Detroit area, that a lengthy trial in New York will disrupt his business and cause him serious financial and personal hardships, and that a significant aspect of his defense will be the testimony of character witnesses, nearly all of whom are from the Detroit area. (Robinson has disclosed to the Court, *in camera,* the names and addresses of character witnesses he plans to call.)

Aronoff avers that he lives and works in the Detroit area, and that all of his witnesses are located there or in Florida. He has not, however, provided the Court a list of witnesses with their addresses and the substance of their testimony.

In opposition to both motions, the Government makes essentially two assertions. *First,* this trial will last at least three and one-half weeks. Consequently, an additional trial will be costly in terms of prosecutorial and judicial resources, and will be a serious inconvenience to the approximately thirty witnesses the Government intends to call. Ten of these thirty witnesses and most of the Government's documentary evidence are located in the New York area. *Second,* according to the indictment, the activities of the defendants for which they are charged centered in and focused upon New York. In an additional response to Aronoff's motion, the Government points out that in a civil action by the Securities and Exchange Commission against Aronoff, his attorney moved to

have the proceedings therein transferred from Washington, D.C., to New York City "so that all of the federal cases against my client and all of the state cases will be in a single city." Transcript of Proceedings at 40, 42, *SEC v. Diversified Industries, Inc.*, No. 76–2114 (D.D.C. June 15, 1977).

Greater detail as to the foregoing facts is provided in the discussion below.

## INDICTMENT

The indictment charges the defendants with conspiracy to defraud Penn Dixie Industries, Inc. ["Penn Dixie"] in connection with the sale of 5,500 acres of Florida land for $6 million. [These are approximate figures.] Penn Dixie is a publicly held corporation with its principal offices in New York City. The defendants are also charged with one count of wire fraud, 18 U.S.C. § 1343, and one count of mail fraud, 18 U.S.C. § 1341.

According to the indictment, a Cayman Islands trust created by Aronoff ["the Aronoff Trust"] obtained an option to purchase 12,500 acres of land in Florida for $5.7 million. Aronoff then allegedly agreed to give Herbert Kesselman, father of the defendant Jerome Castle, a 20% interest in 7,000 of the 12,500 acres if Castle would help Aronoff induce Penn Dixie to purchase the remaining 5,500 acres at an inflated price. Castle at the time was president and chairman of the board of Penn Dixie. With the aid of the defendant Robinson, allegedly involved in real estate speculation and Aronoff's friend, Aronoff and Castle successfully induced the Penn Dixie board of directors to purchase the 5,500 acres for $5.9 million, allegedly without ever disclosing: (1) that a trust controlled by Aronoff was the seller; (2) that what Penn Dixie paid for less than half the tract was more than what the trust had paid for the whole tract; (3) that the land was primarily swampland; and (4) that Aronoff and Castle had a secret agreement for the benefit of themselves and Castle's father.

In furtherance of their plan, the defendants presented to Penn Dixie an "independent" appraisal of the land at $1,075 per acre, an "independent" feasibility study as to the land's development potential, and a development proposal prepared by Aronoff and Robinson, stating that Penn Dixie stood to realize a quick profit of 43%. The indictment charges that all three of these documents were fraudulent, and further charges that Aronoff and Castle caused Penn Dixie to pay Robinson $17,000 for a "review" of the feasibility study "so that Robinson could be paid for his role in the fraud." Indictment, Count One, para. 7(i) (filed October 10, 1978).

The indictment also specifies various acts committed by the defendants in the Southern District of New York. As to Robinson, it charges that he prepared or assisted in the preparation of fraudulent documents used by Aronoff and Castle in New York, and that he mailed a fraudulent letter to the New York office of Penn Dixie. As to Aronoff, it charges that he personally arranged the transactions involving the Aronoff Trust, that he prepared or directed the preparation of fraudulent documents used in New York, that he mailed a fraudulent letter to New York, and that in June and November of 1973, and again in January 1974, he met with officers or directors of Penn Dixie in New York, and each time personally conveyed fraudulent information concerning the land deal.

## DISCUSSION

Rule 21(b) of the Federal Rules of Criminal Procedure provides as follows:

> For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district.

While the rule vests broad discretion in the trial court to determine whether the interests of justice dictate a transfer, the exercise of this discretion is guided by both constitutional history and case law.

In *United States v. Johnson*, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944), Mr. Justice Frankfurter wrote:

Questions of venue in criminal cases . . are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed.

As he and many other judges have recognized, it can be a hardship for a defendant to face trial far away from home and from "appropriate facilities for defense." *Id.* at 275, 65 S.Ct. 249. It has been stated, therefore, that as a matter of policy, a defendant should ordinarily be tried, whenever possible, where he resides. *See, e. g., Hyde v. Shine,* 199 U.S. 62, 78, 25 S.Ct. 760, 50 L.Ed. 90 (1905); *United States v. Cashin,* 281 F.2d 669, 675 (2d Cir. 1960).

These sentiments are, for sure, well founded. One of the grievances listed by the draftsmen of the Declaration of Independence was that the King had assented to legislation "For transporting as beyond Seas to be tried for pretended offenses." But regardless of whether the drafters of the Constitution believed that a defendant ordinarily ought to face trial at home,[1] they chose to subordinate that policy to another and sometimes competing policy. Article III, section 2 provides in part:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed . . . .

The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . .

It would appear then that where a colonist had gone to England and while there engaged in criminal conduct, even our forefathers would not have considered it unfair to transport him there for trial.

Despite the diminished importance of constitutional venue limits under Rule 21,[2] the constitutional language is yet pertinent to illustrate that the historical principles underlying venue policy are fairness and justice generally; the defendant's home district is relevant only as far as considerations of fairness and justice demand. This is the import of the Supreme Court's statement in *Platt v. Minnesota Mining & Manufacturing Co.,* 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), that the location of a corporate defendant's home has "no independent significance in determining whether transfer to that district would be 'in the interest of justice,' although it may be considered with reference to such factors as the convenience of records, officers, personnel and counsel." *Id.* at 245–46, 84 S.Ct. at 772. While it is true that in *Platt,* the Court had before it a corporate defendant, the general principles it stated are applicable to individual defendants as well. *See, e. g., United States v. McManus,* 535 F.2d 460, 463 (8th Cir. 1976), *cert. denied,* 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977); *United States v. Williams,* 437 F.Supp. 1047, 1050–51 (W.D.N.Y.1977).

The Court in *Platt* also quoted a set of criteria that had been employed by the trial court below in deciding whether to transfer the prosecution "in the interest of justice":

> (1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any

---

1. Some writers have suggested that they did. *See Johnston v. United States,* 351 U.S. 215, 224, 76 S.Ct. 739, 100 L.Ed. 1097 (1956) (Douglas, J., dissenting); C. Wright, 1 *Federal Practice and Procedure* § 301, at 579 (1969); Kershen, *Vicinage* (pt. 1), 29 Okla.L.Rev. 801, 808 (1976).

2. The transfer provisions of Rule 21 "represent an exercise by the defendant of his privilege to waive his venue rights." C. Wright, *supra,* § 341, at 619.

other special elements which might affect the transfer.

376 U.S. at 244, 84 S.Ct. at 771 (quoting 314 F.2d 369, 371 n. 1). Although the Court did not expressly approve them, these criteria appear to be generally applicable, and have been employed in many cases after *Platt. See, e. g., United States v. Projansky,* 465 F.2d 123, 139 (2d Cir.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); *United States v. Connelly,* 405 F.Supp. 735, 737–38 (S.D.N.Y.1975).[3] This Court finds them to be appropriate here.

■ Since the defendant Castle has not moved for a transfer, this Court is powerless to transfer this entire case to the Eastern District of Michigan. *United States v. Clark,* 360 F.Supp. 936, 945 (S.D.N.Y.), *mandamus denied sub nom. United States v. Griesa,* 481 F.2d 276 (2d Cir. 1973). Consequently, if either or both of the motions now before the Court are granted, two separate trials will be necessary.[4] As this is a result of no small consequence, the Court must weigh all of the relevant factors with great care.

*The Defendant Robinson*

■ (1) Robinson lives in St. Clair County, in the Eastern District of Michigan, with his wife and three children, aged 14, 12, and 11. He would be unable to afford to bring his family with him to New York. A prolonged trial in this district, therefore, would deprive him of their support during a trying time, and would deprive his family of his presence.

(2) An additional trial would be very inconvenient to any of the Government's thirty witnesses who would have to testify at both trials. But since the Government has not provided the Court a list of witnesses with their location and the substance of their testimony, it is difficult to estimate how many of them would be likely to have to testify twice, and the possible extent of their inconvenience.

Robinson states that a "critical" aspect of his defense will be the testimony of character witnesses, which, he argues, will tend to show that he did not act with fraudulent intent. He has disclosed to the Court, *in camera,* the names of fifteen witnesses who would testify to his good character; thirteen are from the Detroit area; the other two are from Ohio. He has not, however, indicated what other witnesses, if any, he intends to call. Moreover, the Court doubts that he would be allowed to call quite so many character witnesses. *See, e. g., United States v. Zane,* 495 F.2d 683 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). Nevertheless, the Court does agree that the location of character witnesses is significant. As Mr. Justice Murphy noted in his concurrence in *United States v. Johnson,* 323 U.S. 273, 279, 65 S.Ct. 249, 252, 89 L.Ed. 236 (1944):

> Very often the difference between liberty and imprisonment in cases where the direct evidence offered by the government and the defendant is evenly balanced depends upon the presence of character witnesses. . . . The inconvenience, expense and loss of time involved in transplanting these witnesses to testify in trials far removed from their homes are often too great to warrant their use. Moreover, they are likely to lose much of their effectiveness before a distant jury that knows nothing of their reputations.

Where, as here, the indictment itself suggests that a defendant's participation in a conspiracy to defraud consists primarily of preparing and mailing documents for a fee, the defendant's knowledge of the fraudulent objectives of the conspiracy, and his intent to join it, are likely to be key issues

---

3. *Platt* was decided under former Rule 21(b), which allowed transfer "in the interest of justice" only in multi-venue cases. 376 U.S. at 240, 84 S.Ct. 769. It has nevertheless been held to be applicable to cases decided under the current Rule 21(b), as amended in 1966. See cases cited in text.

4. Although Rule 21(b) does not expressly provide for severance, it is a necessary concomitant when a transfer does not involve all of the defendants in a case. *See, e. g., United States v. Clark,* 360 F.Supp. 936, 945–46 (S.D.N.Y.), *mandamus denied sub nom. United States v. Griesa,* 481 F.2d 276 (2d Cir. 1973).

on which evidence of his reputation for honesty and integrity may be highly probative.

(3) Even though much of the activity charged in the indictment took place outside this district, the center of significant events was in New York. The objective of the alleged scheme was to convince persons located in New York to pay more for a tract of Florida land than it was really worth.

Robinson argues, however, that the indictment itself states that all of his acts were done in Michigan. By itself, this is immaterial, since one who uses the mails or a telephone to acquire the money of persons in New York by fraud should hardly be heard to complain that he did nothing in New York. *See United States v. White*, 95 F.Supp. 544, 548 (D.Neb.1951). While it does seem that in Robinson's case the events that occurred in New York and Florida are less likely to be in issue than the knowledge and intent with which he acted in Michigan, the Court finds this to be a relatively unimportant factor here.

(4) Most of the relevant documents in the Government's possession are now located in New York. All relevant documents in Robinson's possession are in Detroit. Since neither party has disclosed the substance of these documents, the Court cannot judge the likelihood that they will be needed for Robinson's trial, or the inconvenience of having to transport them between New York and Detroit. Neither side presses this point strongly.

(5) Robinson is an officer of a small public relations firm in Detroit. He claims that the business is on the brink of failing, and that since the services it provides to its clients are of a highly personal nature, it requires his continuing involvement, especially now.

The Government, disputing none of these assertions, argues that a trial anywhere will disrupt Robinson's business. The Court, however, is not convinced that the extent of disruption would be the same regardless of where the trial is held. To a failing business that depends so much on personal involvement, even a few hours each weekday plus weekends could make a substantial difference. *Cf. United States v. Olen*, 183 F.Supp. 212, 219 (S.D.N.Y.), *mandamus denied sub nom. United States v. Cashin*, 281 F.2d 669 (2d Cir. 1960) (transfer allowed defendants to use evenings and weekends to maintain their accounting practice).

(6) Robinson claims to have earned $14,800 in 1977 and under $10,000 for the first ten months of 1978. He asserts that he cannot afford to travel to New York and live here for the three and a half weeks this trial is expected to take. He insists that he has exhausted every available source of credit and, that if forced to come to New York, he will have to request court-appointed counsel. The Government contests none of these assertions.

The Government points out that the expense of having to conduct a second trial in Michigan would be considerable. The Court agrees. It would mean "substantial duplication of time, effort and money with respect to judicial manpower, government counsel and investigators, . . . witnesses and numerous court personnel." *United States v. Griesa*, 481 F.2d 276, 283 (2d Cir. 1973) (Timbers, J., dissenting).

(7) Robinson has retained a Detroit lawyer and has raised the funds to pay him through friends' contributions of $50 and $100 apiece. This lawyer has averred that he wishes to defend Robinson but will be unable to do so in New York because Robinson cannot afford to pay for his travel and lodging expenses. Moreover, as mentioned above, Robinson claims he will have to request court-appointed counsel if brought to trial in New York.

In opposition, the Government argues that Robinson's Detroit lawyer has no special knowledge of the case and that New York counsel would be able to provide satisfactory representation. This argument misses the point. Although not determinative, the defendant's choice of the person in whom he entrusts his criminal defense is entitled to some weight and may not be so cavalierly dismissed. Moreover, it is hardly true that Robinson's lawyer has no special

knowledge of the case. He has considerably more than any counsel not yet appointed.

The Government also argues that its prosecution team now based in New York will probably have to conduct, or at the very least assist, in Robinson's trial, wherever held, which would add to its inconvenience and expense. The Court agrees. Neither prosecutors nor defense counsel are wholly fungible.

(8) The relative accessibility of New York and Detroit is not an important factor.

(9) None of the parties has indicated that the docket condition of either district is cause for concern.

(10) None of the parties has brought to the Court's attention any other factors that should be considered.

As the foregoing discussion reveals, the most important consideration in deciding this motion is the balance of hardships. This is not, by any means, an easy decision. Either way, substantial hardship and inconvenience will result. Granting the motion will force the Government's lawyers to travel hundreds of miles to duplicate a protracted trial, consume additional court time, and burden the Government's witnesses considerably. Denying the motion will cause the defendant to do without the support of family, friends, and even his chosen counsel, to have his business seriously disrupted, and to suffer such financial hardship that he will be unable to pay for his own defense. It will also be an inconvenience to his witnesses, though these are not likely to be nearly as numerous as those of the Government; nor is their testimony likely to take nearly as long.

Weighing these relative hardships, the Court believes that a transfer of the proceedings against Robinson is in the interest of justice. In any trial joining several criminal defendants, a transfer and severance granted to one of them will result in substantial hardship and inconvenience to the Government and its witnesses. Certainly, the longer the trial lasts, the greater that hardship will be. But this rule holds true for the defendant as well. The question for the Court is whether the moving defendant has made enough of a showing of hardship to outweigh the Government's strong interest in conducting one trial at the place most convenient to itself and its witnesses. In this case, the defendant Robinson has done so.

*The Defendant Aronoff*

■ The decision on Aronoff's motion for a transfer is also difficult, but for a different reason. Whereas with Robinson's motion, either decision would have resulted in substantial hardship to one of the parties and some of the witnesses, with Aronoff's it appears that neither decision will greatly burden or inconvenience anyone.

At the outset the Court notes that had it not transferred the proceedings against Robinson, it would have no difficulty denying Aronoff's motion. But since two trials now have to be conducted anyway, transferring Aronoff to Detroit would not inconvenience the Government. Nevertheless, Aronoff has not satisfied the Court that a transfer of the proceedings against him would further the interest of justice or the convenience of the parties and witnesses.

■ Aronoff claims none of the hardship Robinson would suffer from a New York trial. While Aronoff does live and work in the Detroit area, he has not provided the Court with any facts suggesting that a New York trial would be a burden to him. He makes no claim that his business or family life will be disrupted. He does not state that he would be financially unable either to return to Detroit periodically during the trial, or to bring his family to New York with him. He makes no claims whatsoever of financial hardship. Although he suggests that Michigan would be more convenient to his witnesses he has not disclosed to the Court their names and addresses and the substance of their testimony. And unlike Robinson, Aronoff is already represented in this matter by New York counsel. In fact, it appears that in all the other legal proceedings that have arisen in connection with the Aronoff Trust's Florida land trans-

action, Aronoff is and has been represented by New York and Washington, D.C., counsel. Aronoff even requested that an SEC action involving these transactions be transferred to New York. Finally, his defense will probably place in issue many of the events that allegedly happened in New York, which could result in his extensive cross-examination of New York witnesses. Since the burden is on the moving defendant to justify a transfer under Rule 21(b), see *United States v. Williams*, 437 F.Supp. 1047, 1051 (W.D.N.Y.1977), the Court denies Aronoff's motion.

## CONCLUSION

For the foregoing reasons, the motion of the defendant Robinson for a transfer to the Eastern District of Michigan is granted, and the motion of defendant Aronoff is denied. Fed.R.Crim.P. 21(b). The trial of Robinson is hereby severed from the trial of Aronoff and Jerome Castle.

Accordingly, IT IS HEREBY ORDERED that the instant case as to defendant Edward J. Robinson be, and it hereby is, severed and transferred to the United States District Court for the Eastern District of Michigan for further proceedings.

SO ORDERED.