**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Berdj KEUYLIAN, Defendant-Appellant.**

No. 925, Docket 79–1043.

United States Court of Appeals,
Second Circuit.

Argued April 26, 1979.

Decided June 14, 1979.

Albert Kostrinsky, New York City (Michael L. Levine, Goldstein, Kostrinsky & Lieberman, New York City, of counsel), for defendant-appellant.

Douglas K. Mansfield, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. for the Eastern District of New York, Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before WATERMAN, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Berdj Keuylian appeals from a judgment of the District Court for the Eastern District of New York entered on January 26, 1979, after a jury trial before Henry Bramwell, Judge, convicting him of one count of knowingly delivering to a common carrier for transportation in foreign commerce firearms and ammunition contained in his luggage without written notice to the carrier, in violation of 18 U.S.C. § 922(e).[1] Keuylian was sentenced to three years' imprisonment and fined $5,000; all but four months of the term of imprisonment was suspended, and he was placed on probation for five years. Reversal is sought on numerous grounds, including claims that the denial of a motion for change of venue violated appellant's due process rights and that the warrantless search of Keuylian's luggage violated his Fourth Amendment rights. Finding no merit in any of the contentions, we affirm.

Viewed in the light most favorable to the Government, the evidence established that on April 8, 1978, Keuylian went to Los Angeles International Airport, bound for Jordan. Appellant had a ticket on American Airlines Flight 002 from Los Angeles to New York, with connecting flights on Air France from New York to Paris and from Paris to Amman, Jordan. Keuylian was accompanied to the airport by his mother and his girl friend.

1. Keuylian was acquitted of a second count charging him with willfully exporting articles on the United States Munitions List without a license, in violation of 22 U.S.C. § 2778(c).

Keuylian's luggage consisted of four Samsonite suitcases and two garment bags; one of the garment bags was folded over the other one with masking tape holding the two together, so that there were in effect five pieces of luggage. Inside the baggage were 12 handguns, 2 rifles, and over 1,400 rounds of ammunition, some of it metal-piercing. Keuylian later admitted in his trial testimony that he had purchased most of the weapons and ammunition himself and that he packed his own luggage for the trip.

At the Los Angeles Airport appellant, before boarding the American Airlines flight to New York, checked his luggage all the way through to Amman, Jordan, but failed to give written notice to American Airlines of the presence of the firearms and ammunition in his bags as required by 18 U.S.C. § 922(e). Appellant testified at trial that he gave oral notice to the American Airlines ticket agent when he checked his bags. However, Ms. Lewandowsky, the American Airlines ticket agent on duty April 8, 1978, whose handwriting and two-letter sign assigned by the airline were on Keuylian's baggage claim tags and whose handwriting and personal validation number assigned by the airline were on Keuylian's excess baggage ticket, testified that she did not recall anyone advising her that day that he had firearms in his checked luggage. She also testified, again in conflict with the testimony of Keuylian, that she had no occasion to advise her supervisor of any passenger having reported firearms in his checked luggage.

When appellant arrived at John F. Kennedy International Airport in New York, he checked in at the Air France terminal. Although Keuylian informed the Air France ticket agent that he had five pieces of luggage which had been checked through with American Airlines, he did not advise her, either orally or in writing, that there were firearms or ammunition in the bags.

Keuylian's luggage missed the connecting flight and was therefore still at the Air France terminal at Kennedy Airport on the following day, April 9, 1978. Mary Weston, a security officer employed by Lansdel Protection Agency which had a contract with Air France, was on duty that day x-raying all checked luggage for Air France flights going overseas. As a result of her seeing what appeared to be the outline of guns in the first two bags as they were x-rayed, Mr. Kelly, security manager for Air France at Kennedy Airport, was called to the scene and brought with him Officer Clemens of the Port Authority of New York. Kelly had informed Clemens that certain luggage might contain firearms. Kelly's x-ray examination of the five pieces of appellant's luggage indicated the presence of handguns, rifles, ammunition, and what appeared to be rockets. Officer Clemens did not request the x-ray examination nor did he assist in placing the bags on the machine; however, he was able to view the x-ray monitor.

Kelly and an Air France security guard then carried all five bags to a nearby room, where they were opened by Kelly and examined. Officer Clemens again did not request that the bags be opened, nor did he open or examine any of the bags; he was present, however, while Kelly did so. When Kelly removed a handgun from the first bag, Officer Clemens asked Kelly to stop until Clemens could contact his superiors, which he did. Clemens was instructed by his superiors to inventory all the weapons after they had been removed by the Air France personnel and to take possession of them. Officer Clemens informed Kelly of these instructions. Thereafter Kelly removed all 12 handguns, the 2 rifles and the ammunition from Keuylian's luggage. Clemens prepared an inventory and took possession of the contraband, later turning it over to an agent of the Bureau of Alcohol, Tobacco and Firearms (ATF). Kelly had informed Clemens that there were cancelled checks, photographs and other papers in the luggage, but these items were not removed; Clemens in turn informed the ATF agent.

The following day, ATF agents obtained a search warrant authorizing them to open the bags to recover "photographs, cancelled checks, deposit slips, used airlines tickets,

correspondence." The search warrant was executed at the Air France terminal, where the luggage had remained overnight. The search uncovered three passport-size photographs of Keuylian and nine cancelled checks drawn on Keuylian's personal bank account in Los Angeles.

## DISCUSSION

■ Keuylian first contends he was denied due process when the trial court declined to transfer the case to California pursuant to Rule 21(b) of the F.R.Cr.P.[2] Both parties agree on the basic factors to be considered by the district court in deciding such a motion for transfer: (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) possible disruption of defendant's business if the case is not transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of the place of trial; (9) docket conditions of each district involved. See *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243–44, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964); *United States v. Clark*, 360 F.Supp. 936, 941 (S.D.N.Y.), *petition for writ of mandamus denied sub nom. United States v. Griesa*, 481 F.2d 276 (2d Cir. 1973) (per curiam). Also to be considered are "any other special elements which might affect the transfer." *Platt v. Minnesota Mining & Manufacturing Co., supra*, 376 U.S. at 244, 84 S.Ct. at 771, quoting from 314 F.2d 369, 377 (7th Cir. 1963) (Hastings, C. J., dissenting). The decision to transfer rests in the discretion of the trial judge. *Platt v. Minnesota Mining & Manufacturing Co., supra*, 376 U.S. at 245, 84 S.Ct. 769.

■ Judge Bramwell did not abuse his discretion in denying the motion to transfer the case from New York to California. Although defendant and his attorney were located in California, the Government attorney and the ATF case agent were in New York. New York was accessible to Keuyli-an, who made three plane trips from Los Angeles to Jordan during a seven-month period in 1978. Most of the events at issue occurred in New York, including the discovery of the firearms and ammunition, which were the subject of a later suppression hearing, and appellant's failure to give notice to Air France. Most of the exhibits were located in New York, especially the luggage, firearms, and ammunition. All of the suppression hearing witnesses were in New York; five of the seven Government witnesses at trial were located in New York. While Keuylian's prospective trial witnesses were all located in Los Angeles, the trial court determined that Keuylian could afford to fly them to New York. Indeed, some of these witnesses later testified at the trial in New York. The balance would not have been able, even if brought to New York, to give testimony about the particular transaction at issue on trial.

The most important factor was appellant's delay in moving to transfer the case. The indictment was filed June 23, 1978, and a plea of not guilty was entered on July 6. Defendant's motion to suppress the contraband found in his luggage was filed September 11, 1978. The Government's memorandum in opposition to the motion to suppress was filed on September 20, and defendant's memorandum in support of that motion was filed October 16. Trial had been set for October 10 but was adjourned until October 25. Trial actually began on November 1. Despite this period of more than four months from indictment to trial, the motion to transfer was not filed until October 23, 1978, virtually on the eve of trial. Granting the motion to transfer would have delayed the trial, since the case would then have had to be placed at the end of some other district court's busy criminal docket in California. Another judge and another Assistant U. S. Attorney would have had to familiarize themselves with the case prior to trial. In light of the serious danger of delay in a trial ready to begin,

2. Rule 21(b) provides:

"For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district."

and given the factors of convenience in favor of the Government's position, Judge Bramwell did not abuse his discretion in denying the Rule 21(b) motion.

Appellant also contends that the searches of his luggage violated his Fourth Amendment rights. Keuylian argues that the initial x-ray search by Air France personnel was not a private search because it was dictated by federal regulations, that both the x-ray search and the ensuing physical search of the luggage which Officer Clemens watched were unconstitutional warrantless searches by the Government, and that the later search by the ATF agents pursuant to a warrant was unlawful because the warrant was the fruit of the prior illegal searches.

■ Judge Bramwell found on the basis of testimony at the suppression hearing that the formal security plan submitted by Air France to the Federal Aviation Administration (F.A.A.) did not require x-raying of checked luggage and that "x-raying or screening of checked luggage is not required of foreign air carriers by F.A.A. regulations." He further found that Air France x-rayed checked luggage on all overseas flights from New York and Washington, D.C., on its own initiative and without any request or direction by the Government, that Kelly of Air France had x-rayed the luggage on his own initiative while Officer Clemens watched, and that Officer Clemens made no request for an examination and did not assist in any way. Judge Bramwell similarly found that Kelly of Air France ordered the bags physically searched, and that Officer Clemens neither asked that the bags be opened nor participated in the opening of them. Clemens merely watched. The trial court concluded that as a matter of law the x-ray and physical searches were private searches and therefore not in violation of the Fourth Amendment. The search by ATF agents was therefore pursuant to a valid warrant. In the alternative Judge Bramwell found that the searches, even if deemed to have

been performed by the Government or its agents, were reasonable under the circumstances.

We agree with the trial court that the x-ray and physical searches of the luggage were private searches and therefore not in violation of the Fourth Amendment. See *Coolidge v. New Hampshire,* 403 U.S. 443, 487–90, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). It is therefore unnecessary to reach the issue of whether the searches, if performed by an agent of the Government, would have been reasonable under the circumstances.

■ The inspection of checked luggage by Air France is not required by federal law. There are two F.A.A. regulations cited by appellant which deal with "aircraft security," see 14 C.F.R. §§ 121.538 and 129.-25 (1978). Keuylian relies heavily upon § 121.538. However, these two regulations are mutually exclusive, and Air France as a "foreign air carrier" is governed solely by § 129.25, which does not require the screening of checked baggage.

Section 121.538(b) clearly requires a "screening system" for both carry-on and checked baggage. This section, however, applies only to air carriers as defined in 14 C.F.R. §§ 121.1(a)(1) and (2), i. e., air carriers "engaging in interstate or overseas air transportation under a certificate of public convenience and necessity or other appropriate economic authority issued by the [Civil Aeronautics Board (CAB)]," 14 C.F.R. § 121.1(a)(1), or "engaging in foreign air transportation under a certificate of public convenience and necessity or other appropriate economic authority issued by the CAB," 14 C.F.R. § 121.1(a)(2).[3] All of these regulations are contained in Part 121, "Certification and Operations: Domestic, Flag, and Supplemental Air Carriers and Commercial Operators of Large Aircraft." The certificate of public convenience and necessity issued by the CAB is governed by 49 U.S.C. § 1371, which applies only to any "air carrier." "Air carrier" for purposes of the statute is defined as "any citizen of the

---

**3.** The regulation also applies to a commercial operator engaging in common carriage covered

by 14 C.F.R. § 121.7 (1978), but Air France clearly does not fall within that definition.

United States who undertakes . . . to engage in air transportation." See 49 U.S.C. § 1301(3) (1979).

The other "aircraft security" regulation referred to by appellant, 14 C.F.R. § 129.25, only requires screening of carry-on luggage; there is no provision for screening checked baggage. See 14 C.F.R. §§ 129.-25(a) & (b)(1). This regulation is contained in Part 129, "Operations of Foreign Air Carriers," and applies to any "foreign air carrier holding a permit issued by the Civil Aeronautics Board" pursuant to 49 U.S.C. § 1372. See 14 C.F.R. § 129.1. The permit requirement of 49 U.S.C. § 1372 applies to any "foreign air carrier." For purposes of that statute, a "foreign air carrier" is defined as "any person, not a citizen of the United States, who undertakes . . . to engage in foreign air transportation." See 49 U.S.C. § 1301(22) (1979). Air France is a "foreign air carrier."

■ The definitions of "foreign air carrier" and "air carrier" under the relevant statute are mutually exclusive, since the carrier must be a citizen of the United States to be an "air carrier" and must not be a citizen of the United States to be a "foreign air carrier." The relevant regulations are bifurcated along this same definitional line. The provisions of 14 C.F.R. § 121.538 (1978), requiring screening of checked luggage, apply only to "air carriers"; the provisions of 14 C.F.R. § 129.25 (1978), which do *not* require screening of checked luggage, apply only to "foreign air carriers." There is no claim by appellant that Air France is a citizen of the United States as defined by the statute, see 49 U.S.C. § 1301(16) (1979).

Federal law, therefore, does not mandate any screening of checked luggage by Air France, much less x-raying of such baggage. This interpretation of the relevant statutes and regulations is further supported by the suppression hearing testimony of one Robert Ebel, Chief of the Air Transportation Security Field Office of the F.A.A. at Kennedy Airport, who stated that the x-ray screening of checked baggage was not part of the formal security plan filed by Air France with the F.A.A. and that as far as the relevant F.A.A. regulations were concerned Air France could discontinue x-raying checked luggage at any time. Thus the x-ray screening practice of Air France applied in the present case was purely private conduct, and accordingly the original x-ray search by Ms. Weston did not violate appellant's Fourth Amendment rights.

■ Similarly, neither the x-ray search nor the physical search of the luggage by Air France personnel in the presence of Officer Clemens violated the Fourth Amendment. Judge Bramwell's finding that Officer Clemens neither requested nor participated in either search is amply supported by the record and not clearly erroneous. Officer Clemens merely watched a private search, and the presence of such a witness does not render the Air France personnel instruments or agents of the Government. *Coolidge v. New Hampshire, supra,* 403 U.S. at 487–90, 91 S.Ct. 2022. The Air France personnel were then free to hand the guns and ammunition, which were now in plain view, to Officer Clemens. *Id.* The search warrant executed the following day by ATF agents was valid because the information by which it was obtained was also the product of a purely private search. Thus at no time was Keuylian's luggage subjected to an unconstitutional search.

Appellant's third claim is that the trial court erred in denying Keuylian's motion for acquittal at the end of the Government's case. Appellant contends that the Government failed to prove beyond a reasonable doubt that (1) there was knowing delivery of the guns and ammunition by Keuylian for air transportation in foreign commerce, (2) Air France or American Airlines was a common carrier, and (3) there was no written notice by Keuylian to Air France or American Airlines.

■ It is well established that "[o]nce a defendant offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief, of course, the defendant waives any claim as to the sufficiency of the Government's case considered

alone." *United States v. Singleton*, 532 F.2d 199, 203 n. 5 (2d Cir. 1976), quoting from *United States v. Pui Kan Lam*, 483 F.2d 1202, 1208 n. 7 (2d Cir. 1973), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974). See also *United States v. Mariani*, 539 F.2d 915, 917 (2d Cir. 1976). Any gap in the Government's evidence in the present case was more than adequately filled by the defendant.

▇ Keuylian admitted on the stand in his defense that he packed the firearms in his luggage and then gave the luggage to an American Airlines passenger service representative to be checked in and transported from Los Angeles to Amman, Jordan, via New York City on American Airlines and then Air France. In addition, the defendant stipulated that had the ticket agent for Air France at Kennedy Airport been called as a witness she would have testified that Keuylian, upon presenting his ticket, passport and prepaid excess baggage slip, informed her that he had five pieces of baggage coming off of American Airlines Flight 002 from Los Angeles which were to be transferred to the Air France flight. Thus there was more than enough evidence to prove beyond a reasonable doubt that Keuylian knowingly delivered the luggage and the guns contained in it to both American Airlines and Air France for overseas shipment.

Similarly, there was sufficient evidence that Air France and American Airlines were both common carriers. Keuylian purchased a ticket from American Airlines and that airline carried him from Los Angeles to New York; he also purchased a ticket from Air France and that airline transported him from New York to Paris. In addition, the trial court properly charged the jury, with no objection from the defendant, that Air France and American Airlines are common carriers as a matter of law.

▇ As for the evidence of lack of written notice, the stipulation concerning the testimony of the Air France ticket agent establishes that no written notice or even oral notice was given to Air France by the defendant. Kelly, the security chief for Air

France at Kennedy Airport, also testified that he never received written notice concerning the firearms from Keuylian. Finally, Keuylian himself testified that he gave no notice, written or oral, to Air France. Similarly, Keuylian admitted on the stand that no written notice was given to American Airlines. Although he testified that he gave oral notice to the American Airlines ticket agent, the jury was entitled to credit her contrary testimony. All elements of the offense were therefore established.

▇ Appellant next argues that the trial court erred in allowing, over defendant's objection, a bill of sale to be entered into evidence. The sales slip, Government Exhibit 2, was admitted as a business record of the Bolsa Gun Center. According to the owner of that gun store, the sales slip reflected a sale in January of 1978 to the defendant of a handgun, ammunition, and "a couple of shotguns." Appellant contends that the evidence should have been excluded under Rule 403, Fed.R.Evid., because there were no shotguns involved in the case and the reference to such weapons placed the defendant in the prejudicial light of appearing to be a "gun runner."

Judge Bramwell did not abuse his discretion under Rule 403. The sales slip directly corroborated the gun shop owner's testimony that he had sold a large quantity of weapons to Keuylian, which was relevant to the issue of whether Keuylian knowingly delivered the weapons to Air France in his luggage. The prejudice from the reference to shotguns, on the other hand, was minimal. The jury properly had before it already what amounted to a minor arsenal shipped by the defendant—12 handguns of various sizes, 2 rifles (1 with a telescopic sight), and over 1,400 rounds of ammunition, some of which was metal-piercing. In this context one brief reference to "a couple of shotguns" would hardly inflame the passions of the jury.

▇ Keuylian also claims that the trial court erred in permitting Kelly, the Air France security manager at Kennedy Airport, to testify concerning the results of his

search of the luggage at the airport. Kelly was unable to identify which of the five bags in evidence was the first bag he searched, because his notes identified which bag contained certain firearms by the Air France tag number and the Air France tags had been removed from most of the suitcases. However, Kelly on direct examination did identify Government Exhibit 21 as the third piece of luggage he searched, and he specifically identified Exhibit 24 as the garment bag he searched. On cross-examination he made clear that the four Samsonite suitcases introduced at trial "are the four pieces that we searched. I cannot say which is piece number one, which is piece number two and which is piece number three." Kelly also testified that the bags he searched had one-inch wide masking tape on them, as did the bags introduced at trial, and that the bags he searched all had tags similar to the tags on the bags introduced at trial. In addition, Ms. Weston had already identified the Government exhibits as the bags in which the firearms were found. Thus there was more than adequate foundation to permit Kelly's testimony concerning what he found when he searched the luggage.

 Appellant's next argument—that it was a violation of his Fifth Amendment right against self-incrimination to permit an ATF agent to testify that Keuylian, through his attorney, had demanded and received the return of certain personal property contained in the luggage—must also be rejected. Keuylian voluntarily acknowledged ownership of the personal contents of the seized luggage in writing in the presence of his attorney; any Fifth Amendment right against self-incrimination in this regard was waived. Indeed the defense theory was inconsistent with denial of ownership of the suitcases or of the contents of those bags.[4]

 Appellant's next contention is that his Fifth Amendment rights were violated when he was compelled to produce the cus-

tomer copy of the excess baggage receipt issued by American Airlines covering some of the pieces of luggage in which firearms and ammunition were packed. This claim is without merit. "It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971).

Keuylian testified on his own behalf that when he checked his baggage with American Airlines he gave oral notice of the presence of the weapons and ammunition to the American Airlines ticket agent on duty and to her supervisor. This directly contradicted the testimony of Ms. Lewandowski, the ticket agent who checked in Keuylian. One possible resolution of the conflicting testimony was that Ms. Lewandowski was not in fact the ticket agent on duty that day, which was suggested by defense counsel on cross-examination of her when he noted that the excess baggage receipt bearing her handwriting and personal validation number did not bear a passenger's name and was dated April 7, 1978, rather than April 8, 1978. The customer copy of the excess baggage receipt which Keuylian was compelled to produce bore the same date, number, handwriting and description of contents as the copy prepared by Ms. Lewandowski. Thus the document was "reasonably related" to Keuylian's testimony that he gave oral notice of the presence of the weapons to the American Airlines ticket agent, since it further established that Ms. Lewandowski was that ticket agent and therefore brought her testimony directly into conflict with Keuylian's. Defendant therefore waived his Fifth Amendment right against self-incrimination in this respect.

 Appellant, relying on *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), also contends that the

---

4. In his opening statement defense counsel announced that he intended to prove that Keuylian told American Airlines verbally that he had these guns in the four Samsonite suitcases and the garment bag; there was no contention that Keuylian did not own the suitcases.

statute under which he was convicted, 18 U.S.C. § 922(e), is unconstitutional because it does not require the manufacturer or seller of firearms to give notice to the purchaser that it is a crime to deliver weapons to an airline for transportation without giving written notice. *Lambert* is clearly distinguishable. That case involved a municipal ordinance which made it a crime for a person to remain in Los Angeles for more than five days without registering with the police if the person had been convicted of a felony. The Supreme Court held that this ordinance violated the Due Process Clause of the Fourteenth Amendment as applied when there was no proof of the defendant's actual knowledge or probability of actual knowledge of the duty to register. The Court specifically noted that the conduct made criminal was wholly passive and that "circumstances which might move one to inquire as to the necessity of registration are completely lacking." *Id.* at 229, 78 S.Ct. at 243.

In the instant case there is active conduct—the packing of firearms and ammunition in luggage and the delivery of that luggage to a common carrier for interstate and overseas transportation—plus obvious circumstances suggesting the necessity of inquiring into the applicable legal restrictions. These firearms and ammunition were clearly dangerous, see *United States v. Ruisi*, 460 F.2d 153, 156–57 (2d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972), posing a potential threat to the lives of passengers. The weapons were being shipped to the Middle East, an area of the world in which there is continuing armed conflict. The defendant, as the purchaser of several of the weapons, should have been aware that sale of handguns is regulated by federal and California law since the owner of the gun shop testified that both federal and state documents had to be prepared. Finally, there was Keuylian's awareness as a prior air traveler from Los Angeles to Jordan of the security precautions used to detect weapons in carry-on luggage and on the traveler's person. All of these circumstances would move one to inquire as to the legal requirements of ship-

ping dangerous weapons, and Keuylian testified that he did in fact attempt to make some inquiries. Therefore the limited doctrine of *Lambert v. California* is simply inapplicable; the fact that the transportation of dangerous weapons and explosive ammunition on a common carrier is strictly regulated should not have come as a surprise to the defendant. See *United States v. Ruisi, supra*, 460 F.2d at 156–57, and authorities collected there.

Appellant's final argument— that the sentence imposed was excessive under all the circumstances—is frivolous. We note at the outset that "once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974); *United States v. Seijo*, 537 F.2d 694, 700 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). There is no claim that the sentencing judge relied on materially incorrect information or took into account improper considerations, and therefore the scope of review is quite limited. See *United States v. Mahler*, 579 F.2d 730, 738 (2d Cir.), *cert. denied*, 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978); *United States v. Seijo, supra*, 537 F.2d at 700.

Under a statute providing a maximum penalty of five years' imprisonment, see 18 U.S.C. § 924(a), Keuylian was sentenced to a fine of $5,000 and four months' actual imprisonment, with the remaining two years and eight months of imprisonment suspended. The challenge is only to the four months of actual imprisonment. Appellant was shipping a large cache of deadly weapons and ammunition, he had a prior conviction in Japan, and the trial court noted that "much of the defendant's life including his finances of which he gave a vague account and his motivations in relation to the instant offense of which he gave no account remains unclear." Under the circumstances the sentence was not only legally unassailable but relatively mild.

The conviction is therefore affirmed.