UNITED STATES of America, Appellee,

v.

Harry J. JOHNSON, Appellant.

No. 83–5032.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 1, 1983.

Decided Feb. 16, 1984.

Paul W. Spence, Asst. Federal Public Defender, Baltimore, Md. (Fred Warren Bennett, Federal Public Defender, Baltimore, Md., on brief), for appellant.

Larry A. Ceppos, Asst. U.S. Atty., Baltimore, Md. (J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, and PHILLIPS and ERVIN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Harry Johnson was convicted of making false statements for the purpose of obtaining explosives, in violation of 18 U.S.C.

§ 842(a)(2), and of knowing and unlawful possession of unregistered explosive devices, in violation of 26 U.S.C. §§ 5861(d), 5871. Johnson appeals both convictions. He assigns reversible error in his conviction of making false statements for the purpose of obtaining explosives arguing that he lacked the requisite specific intent for the offense. His conviction for unlawful possession of explosives should be reversed, he argues, because evidence used to convict him was seized on the basis of a warrant for which no probable cause existed. Finding no merit in either contention, we affirm.

### I.

Johnson's arrest and trial resulted from a federal investigation of arson and bombing incidents involving the automobile and residences of Christopher Poole. The connection between Poole and Johnson was a woman named Catherine Council. Poole and Council had been friends for some seven years. Johnson and Council had been dating for approximately two years between March of 1980 and April of 1982. There is some suggestion in the record that Johnson may have been jealous of Poole's friendship with Council.

Poole's residence and automobile were vandalized twice over a one-year period. On August 28, 1981, Poole was living with his sister in an apartment on Lakebrook Circle in Baltimore. At approximately 4:25 a.m. on that date, Poole was awakened by the sound of an explosion which destroyed the front windows of his home. Thereafter, Poole found his automobile in flames. Subsequent investigation produced evidence of arson. The remains of an aluminum butane refill canister and scattered pieces of duct tape were found around the windows. Examination of the automobile revealed that the fuel tank had been removed and fixed with a homemade fuse attached to an M–80 explosive device. Beneath the front of the car, investigators found a plastic milk jug containing a liquid that smelled like gasoline. The jug also had pieces of duct tape attached.

The second set of attacks on Poole occurred during March and April of 1982. On March 6, Poole was living with his parents on McDowell Lane in Baltimore. He was awakened at 5:00 a.m. and discovered that his automobile was in flames. Eventually the fire, which consumed the car, was found to have resulted from two pipe bombs attached to the front and rear of the vehicle. Investigators also found that blue paint had been poured over the windshield and front of the car. Less than one month later, on April 9, Poole's McDowell Lane residence was fire-bombed. The fire department was able to extinguish the blaze, preventing extensive damage.

A week later, on April 16, 1982, Poole received a telephone call at his place of employment. The unidentified caller threatened: "Chris Poole, the next one is for you." Poole testified that a second call was made to him on April 22, 1982 by the same person. On this occasion, the caller identified himself as the "little firebug" and directed Poole to be at a certain bar at 10:00 p.m. that evening. Poole was warned that his failure to appear would result in "another trip out to [Poole's] house." Poole advised federal investigators of both communications.

By arrangement with agents from the Bureau of Alcohol, Tobacco and Firearms, Poole went to the specified club at the appointed time. Undercover surveillance of the area was maintained throughout Poole's visit. One of the investigators noticed a white Toyota occupied by a single white male wearing a "camouflage hat" and an army fatigue jacket. The occupant, eventually identified as Harry Johnson, would periodically look through a pair of binoculars in the direction of the bar. Soon thereafter, investigators approached Johnson who was startled and tried to hide the binoculars. Johnson was subsequently taken into custody and interrogated. During the questioning, Johnson admitted that he knew Poole, that there was some animosity between them, and that he had been dating Ms. Council for two years.

Further inquiries exposed a number of inculpatory facts. First, there was evidence that Johnson had purchased explosive black powder. Two separate transactions were involved. The first, the subject of Johnson's first conviction, was an incomplete or attempted purchase at a local gun shop. The proprietress identified a partially completed form for one pound of powder in the name of Howard Johnston, 600 Cooks Lane, dated August 20, 1981. The name (Johnston) was not defendant's real name (Johnson), and the address was that of a school that he once attended. This transaction was not consummated and the sale was voided because the customer did not produce a driver's license. A handwriting expert identified the signature on the voided form as being written by the defendant Harry Johnson. On the same day, August 20, Johnson succeeded in purchasing black powder from another dealer. For this transaction, Johnson used his real name and address. At trial Johnson admitted purchasing the powder but said that it was used for testing an old flintlock weapon and eventually discarded.

Second, it became apparent that Johnson had access to various items used in the attacks against Poole. A hardware store owner reported that Johnson had purchased galvanized threaded pipe fittings from his store in the early spring of 1982. Those fittings were of a type appropriate for constructing pipebombs. Further, it was revealed that Johnson had access, through Ms. Council, to a can of blue paint of the same variety and brand as that poured over Mr. Poole's automobile in March of 1982.

On the basis of the foregoing facts, a search warrant was issued on May 10, 1982

authorizing a search of Johnson's Toyota for black powder residue. The warrant was executed the next day. No traces of powder were found but several pieces of duct tape, later determined to be "indistinguishable" from that used in the arson, were seized.

## II.

Believing that Johnson used a fictitious name and address during his first attempt to purchase black powder, a jury found Johnson guilty of violating 18 U.S.C. § 842(a)(2). That statute provides that it shall be unlawful for any person:

> ... knowingly to withhold information or to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive *for the purpose of obtaining* explosive materials, or a license, permit, exemption, or relief from disability under the provisions of this chapter;

18 U.S.C. § 842(a)(2) (emphasis supplied).

Johnson's argument that he was improperly convicted is straightforward. He contends that he did not give false statements *for the purpose* of purchasing explosives. He could have purchased, and eventually did purchase, explosives without making any false statements. If he did make false statements, Johnson asserts they were for some purpose other than to obtain explosives; presumably to reduce the likelihood of apprehension. The statute by its plain meaning, Johnson argues, does not proscribe giving false statements for any purpose other than to obtain explosives.[1]

1. We note that the government contends that this question has not properly been preserved for appeal. Though Johnson filed a timely motion for a judgment of acquittal at the close of the government's case, he did not renew the unsuccessful motion at the end of the trial or within seven days of the verdict. The government suggests that this oversight is fatal because of the so-called "waiver rule".

A majority of other circuits have adopted such a rule in a variety of forms. *See, e.g., United States v. Keuylian*, 602 F.2d 1033, 1040–41 (2 Cir.1979); *United States v. Sanders*, 639

F.2d 268, 269 (5 Cir.1981); *United States v. Morris*, 623 F.2d 145, 152 (10 Cir.1980), *cert. denied*, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609. Nevertheless, the "waiver rule" is not universal and has been severely criticized by some courts. *See, e.g., Cephus v. United States*, 324 F.2d 893, 895–98 (D.C.Cir.1963).

We have neither expressly rejected nor adopted the waiver rule and we decline to do so now. Regardless of the substantive merits of the waiver rule, this would be a particularly inappropriate case in which to adopt such a rule. While it is undeniably true that Johnson

We find Johnson's reasoning to be unpersuasive. The interpretation for which Johnson argues is not required by the plain meaning of the statute. We believe that, properly read, the terms "for the purpose of" simply describe the transaction taking place. Put another way, § 842(a)(2) prohibits making false or misleading statements when disclosing information necessary to purchase explosives. The Explosive Materials Act, in another section, requires licensed sellers to obtain certain information from customers and maintain records reflecting that information. 18 U.S.C. § 842(f). We are persuaded that Congress intended to protect the integrity of that record system by prohibiting making false or misleading statements when purchasing explosives. Accordingly, Johnson *was* making representations *for the purpose of obtaining explosives,* because § 842(f) required him to provide certain information during the transaction. We think that when Johnson used false information, he ran afoul of § 842(a)(2) which prohibits false or misleading statements in connection with such purchases.

### III.

Johnson's attack on the sufficiency of the affidavit to establish probable cause is centered on a claimed lack of nexus between the automobile and the items connected with the arsons. While Johnson admits there was sufficient evidence to suspect his involvement in the criminal activity, he contends that the evidence was not sufficient to show that the automobile was in any way connected with the crime so as to justify its search.

The affidavit in support of the warrant states the following in this regard:

... that if a pipe bomb containing black powder or a homemade fuse covered with black powder were carried or assembled in a vehicle there is reason to believe that particles of black powder would have been dislodged from the device or the fuse, particularly from the fuse and unless the particles of black powder had been directly exposed to water or carried away there is a high probability that particles of black powder will remain and will remain indefinitely.

■ From the affidavit, we think that it would be a reasonable assumption on the part of the magistrate that the devices were transported by automobile. First, the successive addresses of Mr. Poole and Mr. Johnson were included in the affidavit. The district court ruled that the magistrate could simply take judicial notice of the distances involved and conclude that Johnson probably used his automobile. A magistrate sitting in Baltimore, familiar with these distances, could properly take cognizance of them. Geographical information of this type would be "generally known within the territorial jurisdiction of the trial court". *See* Fed.R.Evid. 201. Furthermore, geographical information is especially appropriate for judicial notice. *United States v. Piggie,* 622 F.2d 486, 488 (10 Cir. 1980) *cert. denied,* 449 U.S. 863, 101 S.Ct. 169, 66 L.Ed.2d 80. *See, e.g., United States v. Lavender,* 602 F.2d 639, 641 (4 Cir.1979).

Moreover, from the nature of the crimes, it is eminently reasonable to infer that Johnson transported the devices in his car. The crimes necessitated quick escapes, they were committed early in the morning when other means of transportation were less available, and most other means of transportation involve witnesses that could have placed the perpetrator on the scene.

■ Because of the nature of the crime and the distances involved, we conclude that it was reasonable for the magistrate to

---

did not reassert his motion for acquittal at the close of argument, the record clearly indicates that such a reassertion would have been futile. The defense did put on witnesses after the first motion was denied, but none of those witnesses gave any testimony concerning the legal question here at issue. The waiver rule is designed to allow trial courts to have a full and fair

opportunity to rule on an issue before it is taken on appeal. Here the district court had that opportunity; nothing new was presented after the first motion was denied. The government was in no way prejudiced by the failure to reassert the motion at the close of argument. Moreover, we decide that on the merits Johnson's argument cannot be sustained.

believe that Johnson's automobile was a place likely to produce relevant evidence. Probable cause to conduct a search exists if the known facts and circumstances would justify a reasonably prudent person in concluding that the items sought are connected with the criminal activity and that they will be found in the place to be searched. *Carroll v. United States,* 267 U.S. 132, 158–59, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925). The facts here, in our view, meet that test. We reject Johnson's contention that to establish probable cause the affidavit must set forth facts disproving that the explosives were carried in closed containers or that the particles had been subsequently removed. The affidavit did thus establish probable cause, and there was no taint to the evidence obtained in executing it.

AFFIRMED.