**UNITED STATES of America,
Appellee,**

v.

**Miguel VELASQUEZ, Defendant–
Appellant.**

**No. 00–1494.**

United States Court of Appeals,
Second Circuit.

Argued June 29, 2001.

Decided Nov. 15, 2001.

Darrell B. Fields, The Legal Aid Society, Federal Defender Division—Appeals

Bureau, New York, NY, for Defendant–Appellant.

Michael J. Gustafson, Assistant United States Attorney, Hartford, CT (Stephen C. Robinson, United States Attorney for the District of Connecticut, New Haven, CT, on the brief), for Appellee.

Before: MINER, JACOBS, and POOLER, Circuit Judges.

MINER, Circuit Judge.

Defendant-appellant Miguel Velasquez appeals from a judgment of conviction entered in the United States District Court for the District of Connecticut (Chatigny, *J.*) after a jury trial, convicting him of one count of attempted possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. The district court sentenced Velasquez to a 96–month term of imprisonment. Velasquez' conviction stemmed from a reverse-sting operation during which an undercover officer posed as a drug dealer and taped several conversations between himself and Velasquez that purportedly revealed Velasquez' attempt, through the use of coded language, to purchase a kilogram of cocaine. On appeal, Velasquez challenges the sufficiency of the evidence supporting his conviction. It is his present contention that, based on the evidence presented at trial, no rational jury could conclude beyond a reasonable doubt that he knew that cocaine was the contraband that was the object of his attempted purchase.

For the reasons set forth below, we affirm.

## BACKGROUND

### I. *The Arrest*

In October 1999, the Drug Enforcement Administration (the "DEA") began an investigation that targeted Velasquez on the basis of information received from a confidential informant. DEA agent Ezekiel Laureano, who is of Puerto Rican descent and fluent in Spanish, was selected to act as an undercover agent for the investigation. In his dealings with Velasquez, Laureano posed as a drug dealer for the purpose of conducting a "reverse sting." [1] Beginning on October 14, 1999, and over the course of the next five weeks, Laureano and Velasquez engaged in eleven taped telephone conversations during which the two discussed Velasquez' desire to purchase "cars." During these conversations Velasquez used the terms "cars," "exit," "paper," and "car and a half," and Laureano understood them in combination to refer to the purchase and sale of cocaine. On November 22, 1999, Laureano and Velasquez met in person to execute their planned transaction, at which time Velasquez was arrested. Following his arrest, Velasquez was charged in a one count indictment with knowingly and intentionally attempting to possess with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. A jury trial commenced on March 7, 2000 and ended on March 8, 2000 in a guilty verdict.

### II. *The Government's Case*

During the government's case-in-chief, the court received in evidence transcripts of the recorded conversations [2] as well as

---

**1.** Generally, in an undercover operation, "a government agent or informant buys from a narcotics seller an agreed-upon quantity of a controlled substance. In a reverse sting, the government agent provides the agreed-upon quantity of controlled substance to a buyer for a prearranged price." *United States v. Gomez*, 103 F.3d 249, 252 n. 1 (2d Cir.1997).

**2.** The conversations were conducted in Spanish. Laureano translated each of the record-

the testimony of Laureano.[3] Prior to his employment with the DEA in 1988, Laureano had been a member of the Hartford Police Department for approximately seventeen years. His training and experience in narcotics investigations included six months at the Hartford Police Academy and several specialized courses in drug enforcement and investigating techniques. Laureano had posed as an undercover officer for the Hartford Police Department, as both a buyer and seller of drugs, well over 600 times. Laureano also testified that, based on his experiences, it would be "extremely foolish and dangerous" for drug dealers to "speak explicitly about their business when talking to one another," and that they often used "a different language [with] a lot of codes."

The government's case against Velasquez consisted principally of the recorded conversations between Velasquez and Laureano and Laureano's explanations of those conversations. The first of these recorded telephone conversations took place on October 14, 1999, during which Laureano introduced himself and explained to Velasquez that Caguas[4] had asked him to call. Velasquez then asked Laureano, "how are things?" to which Laureano answered: "They're a little light today but for the weekend I'll be heavy." Laureano testified that the term "heavy" is "a common phrase [used] by drug dealers when they have large supplies," and that

he was trying to convey that he "would be replenished by [his] drug suppliers or sources" over the weekend. The conversation then turned to Velasquez asking Laureano whether he could help him purchase a "car." Laureano testified that he "understood one car to mean one kilo of cocaine."

According to Laureano, the two then discussed the details of the transaction:[5]

UC: Are you ready then?

MV: Well then ... what exit?

UC: Uh ... do you know where the McDonald's in Hartford is?

MV: No, no, no, the exit, you know the exit ... the exit of how much? No ... is what I'm trying to say to you.

UC: The papers is what you're saying?

MV: Yes, yes, ah huh, forgive me ... you know is that we haven't spoke in person.

UC: No, I understand ... well if you have the papers we can do it quickly ... what price did he give you?

MV: He's always told me exit seventeen.

UC: Exit seventeen ... I was thinking more or less by exit eighteen ... for the first time but it can be negotiate [sic], understand?

MV: Uh, huh ... fine ... you say that right now you're not ready, no?

UC: For today, for today, it can't be done.

---

ed conversations from Spanish into English. Velasquez did not object to the translations at trial.

**3.** Another DEA agent, Frank DiCarlo, gave testimony describing the various types of investigations conducted by the DEA, including reverse-sting operations. Agent DiCarlo was not permitted to testify that it had come to his attention that Velasquez was a drug dealer who was seeking a new source of cocaine, because the district court concluded that the testimony constituted inadmissible hearsay.

However, DiCarlo did testify that he had provided Laureano with a phone number for Velasquez.

**4.** Caguas purportedly was the confidential informant who identified Velasquez as a potential cocaine dealer. However, the government presented no admissible evidence to that effect.

**5.** "UC" and "MV" refer to Laureano and Velasquez, respectively.

Laureano testified that he believed "exit" referred to the price of the cocaine (*i.e.,* "exit seventeen" meant "$17,000" and "exit eighteen" meant "$18,000"). He also stated that in October 1999 the street price for a kilogram of cocaine in Hartford ranged from $17,000 to $18,000 and up to $21,000. He further explained that "papers" was "common terminology, meaning money, currency."

Approximately an hour later, Velasquez called Laureano to inform him that he had spoken to his cousin and that "he's made arrangement[s] with someone" but that he would not know until Monday how he could "resolve the car." Laureano then asked: "How much do they sell cars?" Velasquez responded that "[their] car is higher." Laureano testified that he understood Velasquez to mean that his cousin had committed to another source of supply and, although Laureano's price was lower, arrangements had already been made with the other source.

Velasquez and Laureano next spoke more than two weeks later on October 28, 1999. Over the course of that day, the two had five telephone conversations regarding Velasquez' desire to purchase a "car" or "cars" from Laureano. During the first call, Velasquez asked: "And the cars? Always there, no?," to which Laureano replied "[y]es, there ... [sic] a couple." Laureano testified that he meant to convey to Velasquez that he had the supplies of cocaine and always did. Velasquez also mentioned a friend of his from Boston, which Laureano interpreted to mean that Velasquez "had a partner ... or someone who was able to go in on a deal." During the second call, Laureano asked Velasquez how many "cars" he wanted; Velasquez said he needed "two cars" but would have to call his friend in Boston before making a commitment.

During their third conversation, Laureano informed Velasquez that "[i]n reality I have three cars and I was going to give you a phenomenal price." Velasquez then asked, "[i]f the guy [in Boston] grabs all three cars, what exit will each go?" After Laureano indicated that "each one will go ... for ... sixteen," Velasquez asked, "[h]ow about for less?" However, Laureano refused to lower the price. A few moments later, Velasquez informed Laureano that the man from Boston would call him shortly and that he "has enough for a car and a half." Laureano responded that he would not sell Velasquez a car and a half. Laureano testified that the reference to "a car and a half" indicated a desire to acquire a "kilo and a half" of cocaine.

In their fourth call, Laureano explained to Velasquez that "[t]he cars are good" and Velasquez interjected that "[t]hey're not rebuilt cars." Laureano then responded: "Exactly, exactly.... If one takes ... exactly ... one takes and wins a race you can get three [or four] time[s] the money." Laureano testified that in this exchange he intended to convey to Velasquez that the cocaine he had for sale was of "really good pure quality"; that is, the cocaine was "not rebuilt," meaning it was "uncut" or undiluted cocaine. He further indicated that his statements regarding "three" and "four times the money" referred to the practice of cutting cocaine so that a dealer could increase his profits on resale. In their final conversation, Velasquez informed Laureano that the man from Boston wanted "two cars" but "he has for one." Laureano understood this to mean that the "money supplier had enough to buy one kilo [of cocaine], but he actually wanted two."

Laureano next spoke with Velasquez on November 10, 1999, when Velasquez indicated that he was "crazy for work." Laureano testified that he understood

this exchange to mean that Velasquez was anxious to do business. A week later, on November 17, 1999, the two had a conversation that, according to Laureano, demonstrated that Velasquez was trying to persuade him to provide cocaine on consignment, a practice known as "fronting." [6] Laureano also explained that Velasquez had offered him an extra thousand dollars for such an arrangement when Velasquez stated: "I'll bring it up one point for you. I'll pay you around exit eighteen."

Laureano also testified to an unrecorded conversation with Velasquez that occurred on November 21, 1999. Laureano testified that Velasquez had called him and stated that he only managed to obtain $12,000. Laureano further testified that he agreed to accept $12,000 against the purchase price of $17,000 on the following terms: "[Velasquez] would give me 12 and he would supposedly pay the balance at a later time [and therefore] it was my understanding that I was going to give [Velasquez] a kilo of cocaine for $12,000."

On the morning of November 22, 1999, Laureano called Velasquez in response to a page from Velasquez and the two agreed to execute the transaction that night. At about 3:30 that afternoon, the two had a conversation in which Velasquez asked Laureano if they could meet earlier because Velasquez had to pick up his girlfriend at the airport at 8:00 that evening.[7] Laureano declined and the two then

agreed to meet at 7:00 p.m. in the parking lot of a McDonald's in Hartford. After Laureano gave Velasquez directions to the McDonald's, he informed Velasquez how the transaction would unfold: "I'll get out, you show me the papers, and I'll throw it to you ... in five minutes."

At about 8:20 p.m., Velasquez arrived at the McDonald's where Laureano was waiting. The recorded conversation indicated that Laureano initially told Velasquez to "show it to me quickly so I can get it in the car." Velasquez then informed Laureano that he only had "eleven." Laureano testified that Velasquez then pulled out a large freezer bag filled with money and showed it to him. Laureano then told Velasquez that he would "go get it." Laureano left the immediate area and signaled law enforcement personnel to arrest Velasquez. Velasquez was arrested and authorities found $10,960 in the freezer bag.

At the close of the government's case, Velasquez moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"), claiming that the government's evidence failed to demonstrate that Velasquez understood the subject of his conversations with Laureano to be the purchase and sale of cocaine. The court denied the motion.

## III. *Velasquez' Defense*

After the district court denied his Rule 29 motion, Velasquez presented a defense, consisting of his own testimony and the

---

**6.** Laureano's testimony was based on the following colloquy:

> MV: You won't regret it my friend because I won't run.... I don't run ... that's nonsense brother ... what I can ... I tell you I ... the one I put out there, I can take out five and six cars weekly....
> UC: O.K.
> MV: ... and the one I take out three cars then I can buy mine.

**7.** During this conversation, Laureano indicated that the airport is a "dangerous" place to execute the transaction. Velasquez appeared undeterred, stating, "[i]t's perfect there brother.... Everyone is there opening the trunks to put luggage in and stuff...." Laureano testified that he understood Velasquez to be saying that "all the congestion in the parking lot at the airport ... wouldn't attract any attention ... [and] would be ideal for a drug transaction."

testimony of three others. Velasquez explained to the jury that he and his partner Edwin Santiago were in the business of buying and selling used cars and that he believed that his conversations with Laureano involved the sale of automobiles. To support this contention, Velasquez presented the testimony of Santiago, Anthony Trabal, and Mark Bousquet. Santiago testified that Velasquez had worked at his (Santiago's) body shop and that the two were in the business of buying cars. They would buy the cars using Trabal's license, and Velasquez would help fix and resell them. Trabal testified that he owned a used car lot in Massachusetts, and would at times attend auctions with Santiago to buy cars. Trabal also testified that he had seen Velasquez at these auctions "a couple of different times," but that he had no formal business dealings with him. Bousquet, a used car dealer, testified that he had observed Santiago and Velasquez buying cars together.

Velasquez also provided explanations to rebut some of Laureano's testimony. He testified that he had not asked Laureano about the specifics of the cars in any of their conversations because he intended to inspect them when he met Laureano. He also indicated that in Puerto Rico, where he grew up, a "car and a half" referred to a car that had been "crashed in the front." He further denied that his discussion about the airport was a suggestion to do business there.

At the close of testimony on March 8, 2000, Velasquez renewed his motion for a judgment of acquittal. The district court again denied the motion and the case was submitted for the jury's consideration. That same day, the jury returned a guilty verdict against Velasquez on the sole count contained in the indictment. On June 23, 2000, the district court sentenced Velasquez to 96 months in prison and entered its judgment of conviction. This appeal followed.

## DISCUSSION

On appeal, Velasquez contends that the evidence presented at his trial was insufficient to support his conviction for attempted possession with intent to distribute cocaine. More specifically, he contends that the evidence presented at his trial failed to establish that he knew that the object of his attempted purchase was in fact cocaine.

■■■ A defendant who challenges the sufficiency of the evidence supporting his conviction "bears a heavy burden." *United States v. Finley*, 245 F.3d 199, 202 (2d Cir.2001); *see also United States v. Walsh*, 194 F.3d 37, 51 (2d Cir.1999). In evaluating whether the evidence was sufficient to convict a defendant, we consider all of the evidence, both direct and circumstantial, "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir.1999) (internal quotation marks omitted); *see also United States v. James*, 239 F.3d 120, 123–24 (2d Cir.2000). In addition, "[w]e defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998). Accordingly, to succeed, Velasquez must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir.2001) (internal quotation marks omitted); *see also United States v. Bryce*, 208 F.3d 346, 352 (2d Cir.1999).

In evaluating the sufficiency of the evidence, we are not limited to the government's case and may look to the testimony of Velasquez, who testified in his own defense. *See United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir.1995) ("[B]y testifying in his own behalf at trial, a defendant waives his right to have sufficiency assessed on the basis of the government's presentation alone.") (citing cases). A defendant's testimony may thus add weight to the government's case. *Id.* To put it another way, a jury may "use its disbelief [of a defendant's testimony] to supplement the other evidence against him." *United States v. Stanley,* 928 F.2d 575, 577 (2d Cir.1991); *accord United States v.. Eisen,* 974 F.2d 246, 259 (2d Cir.1992) ("[T]he jury is free to draw negative inferences from an untruthful witness's testimony as long as there is affirmative testimony to supplement or corroborate those negative inferences."). However, "[i]n each of the cases in which the jury's disbelief was relied on as a factor supporting affirmance, the evidence apart from the incredibility of the defendant's testimony was sufficient or very close to sufficient." *United States v. Tyler,* 758 F.2d 66, 69 (2d Cir.1985). Accordingly, "the jury's disbelief of a defendant's testimony may supplement already existing evidence and help make the evidence in a borderline case sufficient." *Id.* at 70.

At this point, we note that Velasquez contends that our inquiry is limited to evaluating the sufficiency of the evidence based solely on the government's case-in-chief because he first moved for judgment of acquittal at the close of the prosecution's case. Velasquez relies on *United States v. Autuori,* 212 F.3d 105, 108 (2d Cir.2000), a case in which we limited our review of the sufficiency of the evidence on appeal to the government's evidence "[b]e-cause [the appellant] first moved for judgment of acquittal at the close of the prosecution's case-in-chief." However, *Autuori* involved a situation in which the district court reserved its ruling on the motion until the close of all the evidence. *See United States v. Autuori,* No. 3:96–CR–161, 1998 WL 774232, at *1 (D.Conn. Aug.28, 1998). The 1994 Amendments to Rule 29 specifically provide that if a district court *reserves decision* on a motion for a judgment of acquittal, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R.Crim.P. 29(b). The commentary indicates that courts of appeals are similarly limited. *Id.* (Advisory Committee Notes to 1994 Amendments). However, neither the rule nor the 1994 Amendments thereto limits the scope of our review when a defendant's motion for a judgment of acquittal is *denied* at the close of the government's case-in-chief and then denied again after the motion is renewed at the close of trial.

It has long been the rule in this Circuit that "[o]nce a defendant offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief … the defendant waives any claim as to the sufficiency of the Government's case considered alone." *United States v. Maniego,* 710 F.2d 24, 28 (2d Cir.1983) (quoting *United States v. Keuylian,* 602 F.2d 1033, 1040–41 (2d Cir.1979)); *see also United States v. Pui Kan Lam,* 483 F.2d 1202, 1208 n. 7 (2d Cir.1973). Said differently, a defendant who presents a defense following a district court's denial of his motion for judgment of acquittal made at the close of the government's case, waives any challenge to that denial. *See id.* Thus, "a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense,

with the risk that in doing so he will bolster the Government case enough for it to support a verdict of guilty." *McGautha v. California,* 402 U.S. 183, 215, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated in part on other grounds sub nom, Crampton v. Ohio,* 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972). Velasquez' motion for judgment of acquittal at the close of the government's case-in-chief was denied and he chose to present evidence in his defense. We may therefore evaluate his sufficiency of the evidence challenge based on the entire record.

■ Upon such a review, we find that the evidence presented at Velasquez' trial was sufficient to support his conviction. The sole count in the indictment charged Velasquez with the crime of attempting to possess with intent to distribute 500 grams or more of cocaine. An essential element of this crime is Velasquez' knowledge that the subject matter of his dealings with Laureano was at least 500 grams of cocaine. To prove this knowledge, the government relied on Laureano's testimony and the transcripts of the taped conversations.

Laureano testified that he understood Velasquez' use of the term "car" to be a coded reference to a kilogram of cocaine and Velasquez' desire for a "car and a half" to be a reference to a kilogram and a half of cocaine. In addition, Laureano explained that he understood Velasquez' use of the terms "exit 17" and "exit 18" during their price negotiations to be code for $17,000 and $18,000. Laureano testified to an unrecorded conversation in which Velasquez had ultimately agreed to pay $17,000 for the cocaine, but that the two had reached a compromise in which Velasquez would pay $12,000 initially and then pay the outstanding balance at a later time. Laureano further indicated that the street price for a kilogram of cocaine in Hartford during the relevant time period was between $17,000 and $21,000.

Velasquez' counsel conceded at oral argument that this evidence, viewed in the light most favorable to the government, was sufficient for a rational jury to conclude that Velasquez and Laureano were negotiating the sale of something other than automobiles for between $17,000 and $21,000. We agree, and believe further that the evidence was sufficient for a rational jury to conclude that Velasquez sought to purchase drugs, specifically cocaine. We have recognized that "drug dealers rarely speak openly about their trade" and instead "often engage in a so-called 'narcotics code.'" *United States v. Cancelmo,* 64 F.3d 804, 808 (2d Cir.1995) (quoting *United States v. Sisca,* 503 F.2d 1337, 1343 (2d Cir.1974)). Indeed, we have observed that individuals dealing in cocaine utilize a variety of terms to refer to the illegal substance. *See, e.g., Bryce,* 208 F.3d at 349 (using "straight" to refer to cocaine); *United States v. Fermin,* 32 F.3d 674, 679 (2d Cir.1994) (using "wedding dresses" to refer to cocaine); *United States v. Sureff,* 15 F.3d 225, 228 (2d Cir. 1994) (using "Honda Prelude" to refer to cocaine). Based on the veiled and cryptic language used by Velasquez in the recorded conversations, and Laureano's testimony, it was reasonable for the jury to infer that the transaction involved the sale of some type of illegal drug.

Despite this, the government's burden in this case was to prove beyond a reasonable doubt that the substance in question was in fact cocaine. The government's evidence establishes that *Laureano* understood that Velasquez wanted to purchase a kilogram of cocaine and that Velasquez' conduct, including the price negotiations and the price ultimately agreed upon, was consistent with that belief. Whether this evidence alone is sufficient to establish

that Velasquez had the same understanding is a closer question.

In *Sureff*, which the government calls "strikingly similar" to this case, the defendant was charged with conspiracy to distribute and possess with intent to distribute a substance containing cocaine. *See Sureff*, 15 F.3d at 226. The evidence against the defendant included the testimony of two federal agents, both of whom described taped telephone conversations involving the defendant and his co-conspirators using coded language to execute the sale and distribution of cocaine. *See id.* at 227. During these conversations, the defendant and other co-conspirators discussed various items "in disjointed and occasionally incomprehensible fashion," including "tickets," "the man," "real estate taxes," "cars," "houses," "papers," "licenses," "catering," "seafood platters," "the bank," "paperwork," "three-star meals," and "the rent," mostly in connection with disputes over prices to third parties for the commodity under discussion. *Id.* In addition, surveillance by federal agents revealed that the defendant engaged in activities consistent with cocaine trafficking. For example, although the defendant had told another person that she had spoken with "the people at the bank" and that they would "do the thing" the next day, surveillance revealed that the defendant had visited only three locations the next day, none of which was a financial institution, and she had not placed any calls to any financial institution. Instead, the defendant was observed visiting a house where the comings and goings strongly suggested that it was a locale for cocaine trafficking. *See id.* at 227–28. We affirmed the conviction.

First, we found that the coded language, used by the defendant and his co-conspirators to hide the nature of the transaction, could lead a rational jury to conclude that the conversations involved trafficking in contraband. *See id.* at 228. Second, we identified persuasive evidence that the commodity in question was in fact cocaine. Specifically, the defendant had discussed with a co-conspirator the sale of a Honda Prelude for "24 or 25," and testimony revealed that a kilogram of cocaine had a street value of $23,000 to $27,000 in the relevant market. This evidence tended to demonstrate that the commodity in question was cocaine rather than a Honda Prelude because the average retail price for a 1989 Honda Prelude at that time was between $11,000 and $11,500. *See id.* Adding support to this conclusion was evidence in the taped conversations revealing that the transaction had a potential for violence, which often accompanies drug trafficking. *See id.* at 227. Finally, surveillance of the defendant's activities revealed inconsistencies between the coded conversations and defendant's actual activities, including her trip to a house apparently the site of cocaine distribution. *See id.* at 229.

The government's case-in-chief here is somewhat weaker than it was in *Sureff*. Here, the government offered very little evidence to demonstrate that Velasquez understood that the subject matter of the transaction was in fact cocaine. Unlike in *Sureff*, the government presented no surveillance evidence to corroborate the undercover's explanation of the coded conversations. The only supporting evidence is the fact that Velasquez apparently agreed to pay $17,000 (the going price for a kilogram of cocaine) for the "car" and then showed up at the McDonald's parking lot with approximately $11,000 to make the purchase. While these facts demonstrate that Velasquez' conduct was consistent with a desire to purchase cocaine, it was not entirely clear that this was so. For this reason, had the trial ended at the close of the government's case-in-chief, the

question of sufficiency would have been a more difficult one.

However, Velasquez presented a defense in which he attempted to rebut the government's evidence by explaining that he was a used car dealer and that he believed his conversations with Laureano were in reference to his prospective purchase of automobiles. He conceded that he never had asked Laureano about the specific make, model, or year of the cars, but explained that he intended to inspect them when he met Laureano. With respect to his reference to "a car and a half," Velasquez stated that, like most Puerto Ricans, he used this phrase as a reference to an automobile that was "crashed in the front." In addition, it appears that Velasquez wanted the jury to believe that the references to an "exit" meant an exit off the highway. However, Velasquez provided no justification for his "exit of how much?" inquiry. It takes no stretch of the imagination to conclude that the jury could have completely disbelieved Velasquez' testimony and utilized this disbelief in conjunction with the government's evidence to convict him.

While the government's case-in-chief may have been weak, the jury's distrust of Velasquez' incredible testimony served to transform the evidence in this case from borderline to sufficient. Velasquez presented no evidence and made no argument until this appeal to support the contention that the subject matter of the transaction could have been some contraband other than cocaine. Moreover, there is no evidence in the record of any other contraband that sold for $17,000 to $21,000 per unit that would support this argument. At trial, Velasquez simply tried to "sell" his story that the transaction involved the sale of automobiles. The jury was thus left to balance the taped conversations, the testimony of Laureano, and the fact that Velasquez showed up at what Laureano understood to be a cocaine transaction, against Velasquez' unbelievable account of events. We hold that, under these circumstances, a rational jury could have found that the evidence presented by the government, supplemented by the jury's disbelief of Velasquez' testimony, was sufficient to establish Velasquez' guilt beyond a reasonable doubt.

We have considered all of Velasquez' other arguments and find them to lack merit.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.